**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ABEX CORPORATION—AEROSPACE DIVISION, Respondent.**

No. 75–1711.

United States Court of Appeals, Ninth Circuit.

Oct. 7, 1976.

Paul Spielberg, Atty. (argued), NLRB, Washington, D.C., for petitioner.

Alvin F. Slaight (argued), of Paul, Hastings, Janofsky & Walker, Newport Beach, Cal., for respondent.

Before HUFSTEDLER and TRASK, Circuit Judges, and FERGUSON,* District Judge.

PER CURIAM:

The National Labor Relations Board ("the Board") petitions this court to enforce an order issued against Abex Corporation—Aerospace Division ("Company") arising out of alleged violations of the National Labor Relations Act, subsections (a)(1) and (a)(5) of Section 8 (29 U.S.C. § 158) (unfair labor practices). Since the violations allegedly

---

* Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

occurred in California, this court has jurisdiction under Section 10(e) (29 U.S.C. § 160(e)).

The Board's order is reported at 215 N.L. R.B. No. 114. We deny the petition.

In 1972 the production and maintenance employees at the Company voted to be represented by the Oil, Chemical and Atomic Workers International Union ("Union"). The Company and the Union reached an agreement which applied to "all operating and maintenance employees as outlined in the National Labor Relations Board Certification" and excluded "all of the Company's other employees from coverage by this contract." A month later the Union petitioned for a representation election in a proposed separate unit composed of certain salaried employees excluded from the previously certified production and maintenance unit. Because the Regional Director found that the salaried employees shared a community of interest with the union members and performed similar functions, however, he directed that the salaried employees vote whether they wished to join the existing bargaining unit.[1] The decision and direction of election specifically provided that:

> "If the majority of the employees . . . vote to be represented by Petitioner they shall be deemed to have signified their desire to be included in the existing bargaining unit . . . for which Petitioner was certified."

Prior to the election the Company informed each salaried employee that "[M]anagement's opinion is that if employees are added to the bargaining unit, then they are also automatically covered by the existing collective bargaining agreement. Thus . . . you will simply acquire the labor grade and hourly wage rate commensurate with the skills and job classification you now hold. . . . [Y]ou will acquire those fringe benefits, and *only* those fringe benefits, provided for in the existing contract." After a majority of the workers had voted to join the bargaining unit and the Regional Director had certified that the Union "may bargain for the employees . . . as part of the group of employees it currently represents," the Company upon the Board's certification of the result of the election started paying hourly wages to the salaried employees based upon the corresponding position in the existing bargaining unit. In addition it eliminated the fringe benefits payable to salaried employees and substituted those fringe benefits accruing by contract to hourly paid unit employees. No former salaried employee suffered a pay reduction as the result of his conversion to an hourly wage, some getting increases. There was, however, a significant reduction in fringe benefits.

With two members dissenting, the Board affirmed the administrative law judge's conclusion that the Company's notification to the employees before the election and its acts afterward constituted interference with the employees' right to organize and a refusal to bargain, violations of subsections (a)(1) and (a)(5) of section 8 of the National Labor Relations Act (29 U.S.C. § 158).[2] The Board ordered the Company to reinstate the *status quo* as it existed prior to the second election, to stop applying the contract to the new union members, to bargain with the union regarding the new members' terms of employment, and to post the usual notices for the benefit of the employees.

We are asked to determine whether the Board's order adopting a rule first applied to a *Globe* election in *Federal-Mogul Corp.*,

---

**1.** Such an election is called a *"Globe* election," following the Board's decision in *Globe Machine & Stamping Co.*, 3 N.L.R.B. 294 (1937), permitting employees sharing the same community of interest as an already represented unit of employees to vote whether to join the existing bargaining unit.

**2.** Subsection (a) makes it an unfair labor practice for an employer

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [permitting workers to join unions and bargain collectively] . . . ;

. . . . .

(5) to refuse to bargain collectively with the representatives of his employees . . .

*Bower Roller Bearing Division*, 209 N.L.R.B. 343 (1974), was correct. There, as here, the majority indicated that if the unrepresented group elects to join a represented unit already subject to an existing collective bargaining agreement, the employer may be required to bargain in good faith with the union concerning the extent to which that contract should be applied to the newly associated employees before changing any of its conditions of employment. In reaching this conclusion they reasoned that it would be unfair for an employer to be forced to negotiate with a represented unit concerning wages and benefits that could later apply to an additional group of workers whose identity and number are at the time totally unknown to either party. In each case the Board's two dissenting members have taken a contrary position based on what they viewed as an important distinction between *Globe* and representation elections: they argued that no additional bargaining is necessary and that the terms of the existing contract should govern with respect to the formerly unrepresented group so that no bifurcation of the bargaining unit for the duration of the existing contract and no possibility of industrial strife that could arise as a result of unsuccessful new negotiations would occur. Moreover, any inequities that would arise or mitigating circumstances that exist could be remedied or taken into account at the time of negotiations for the next unit contract.

Without expressing any opinion concerning the correctness of the Board's decision in *Federal-Mogul Corp.*, we decline to follow it here in view of the specific factual circumstances presented in this case. As was true in *Federal-Mogul*, a sufficient "community of interest" was found between the originally excluded employees and those represented by an existing unit to permit the holding of a *Globe* election. In addition, however, in this case, the Regional Director found that the work performed by the excluded salaried employees was "functionally similar" to that performed by certain employees within the existing bargaining unit. No such finding was evident in

*Federal-Mogul* where the excluded employees were set-up men who prepared and checked machines for others to operate. Because only differences in fringe benefits and in some instances pay were involved while the services rendered by the employees included in the represented unit at the time the existing contract was adopted and those included as a result of the *Globe* election were nearly identical, we find the reasoning of the dissent as applied to this case persuasive and therefore deny the enforcement of the Board's order.