CITY OF DES MOINES, Iowa, Appellee,

v.

PUBLIC EMPLOYMENT RELATIONS BOARD, Appellant,

and

Des Moines Association of Professional Fire Fighters, Intervenor.

No. 61657.

Supreme Court of Iowa.

Feb. 21, 1979.

Richard C. Turner, Atty. Gen., Carlton G. Salmons, Asst. Atty. Gen., and Nancy D. Powers, Public Employment Relations Board, Des Moines, for appellant.

John R. Phillips, Russell L. Samson and David H. Goldman, of Rogers, Phillips & Swanger, Des Moines, for appellee.

Harry H. Smith, of Smith & Smith, Sioux City, for intervenor.

William F. Sueppel, of Meardon, Sueppel, Downer & Hayes, Iowa City, for amicus curiae League of Iowa Municipalities.

Charles E. Gribble, of Dreher, Wilson, Adams & Jensen, Des Moines, for amicus curiae Iowa State Education Association.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, HARRIS and ALLBEE, JJ.

ALLBEE, Justice.

The question presented is whether the Public Employment Relations Board has the statutory authority, under § 20.22, The Code, to order binding arbitration between a public employer and a certified employee organization under these conditions: (1) the public employer is a political subdivision of the state; (2) the public employer's certified budget submission date will pass before completion of such arbitration; and (3) the public employer has not joined in the request for arbitration.

This appeal arises out of the following events. The City of Des Moines filed a petition with the Board for declaratory ruling on June 17, 1977. That petition presented these facts, upon which the Board was to base its ruling:

1. A municipal corporation, a public employer within the meaning of Section 3(1) of the Iowa Public Employment Relations Act, and an employee organization within the meaning of Section 3(4) of that Act, commenced negotiating in advance of the public employer's certified budget submission date and have negotiated in good faith as required by Section 9 of the Act.

2. The public employer and the employee organization have not agreed upon any impasse procedures during their negotiations within the meaning of Section 19 of the Act, and therefore the impasse procedures provided in Sections 20, 21 and 22 of the Act are applicable.

3. One of the two parties, on a date less than 120 days prior to the certified budget submission date of the public employer, requests the appointment of an impartial or disinterested person to act as mediator, as provided by Section 20 of the Act, and such a mediator is appointed by the Public Employment Relations Board.

4. The mediation procedure set forth in Section 20 of the Act fails to result in an agreement between the parties.

5. Pursuant to Section 21 of the Act, the Public Employment Relations Board appoints a fact-finder representative of the public. The written findings of fact and recommendations are issued and served upon the public employer and the certified employee organization on a date which is later than five days prior to March 15, the certified budget submission date of the public employer.

6. The impasse is not resolved within 10 days after the fact-finder's written report is submitted (that is, at a point in time after the certified budget submission date of the public employer), and the report is made public by the Public Employment Relations Board.

7. The impasse is not resolved after this publication of the fact-finder's written report.

8. The certified employee organization unilaterally requests the Public Employment Relations Board to arrange for binding arbitration pursuant to Section 22 of the Act, after March 15—the certified budget submission date of the public employer.

9. Pursuant to the provisions of, and the strictures of, Chapter 24 and Chapter 384, Code of Iowa (1977), the public employer has—as of the date of the request—finally adopted a budget which contains a specific dollar amount as an appropriation for the particular program (with specified purposes) for the public employees represented by the employee organization.

The city then posed several specific questions upon which it desired the Board's opinion. The dispute at this juncture is centered on the city's first question:

1. Whether the Public Employment Relations Board, in light of the timetables and the legislative scheme for the resolution of negotiations impasses contained in Sections 19, 20, 21 and 22 of the Public Employment Relations Act and consonant therewith, has the jurisdiction or the statutory authority to consider a request to arrange binding arbitration filed by a certified employee organization after the certified budget submission date of the public employer, if the public employer with which that employee organization is negotiating has not joined in the request?

The Des Moines Association of Professional Fire Fighters petitioned for intervention, alleging that it could be adversely affected by the ruling which the city sought. The Board permitted the intervention and thereafter issued its declaratory ruling on August 23. In that ruling the Board held that the Public Employment Relations Act (chapter 20, The Code) imposed no deadline for the completion of binding arbitration undertaken in compliance with §§ 20.20–.22. The city then petitioned the district court for judicial review. In a carefully considered opinion the district court disagreed with the Board's interpretation of the statute. It found that the legislative intent was to require completion of arbitration prior to the certified budget submission date for political subdivisions, which is March 15. Section 24.17, The Code. We find ourselves in agreement with the district court's position and affirm.

Certain highlights in the history of the Public Employment Relations Act and the Board's construction of that Act are relevant to our inquiry. The Act was passed in 1974 by the 65th General Assembly. Chapter 1095, § 29 of the Acts of the 65th General Assembly declared that the provisions relating to the duty to bargain would become effective on July 1, 1975. Collective bargaining between the state (as distinguished from its political subdivisions) and its employees was not to begin until June 1, 1976.

The Act prohibits strikes by public employees, § 20.12, The Code, replacing this economic weapon with a statutory impasse procedure. That procedure consists of three steps: mediation, fact-finding, and binding arbitration. *See* §§ 20.20–.22, The Code; Pope, *Analysis of the Iowa Public Employment Relations Act,* 24 Drake L.Rev. 1, 35–41 (1974) [hereinafter cited as *Pope*].

On November 14, 1975, the Board issued the first in a series of rulings considering the question of whether statutory impasse procedures under §§ 20.20–.22, may be conducted subsequent to March 15. In *Belmond Community School District,* PERB Case No. 558 (1975), the Board issued a declaratory ruling holding that in light of the "significant correlation between collective bargaining and the process of budget compilation, approval and certification," the legislature intended that March 15 would be a deadline. The decision was issued prospectively to provide guidance in implementation of impasse procedures in the first year of collective bargaining. The Board expressed some concern, however, that the statutory scheme might not "reflect the realities of the collective bargaining process. . . ."

In another decision, filed on July 1, 1976, the Board confirmed the position taken in *Belmond.* In *City of Cedar Falls and Over the Road and City Cartage Drivers,* PERB Case No. 712 (1976), the Board was required to rule on a motion by the city for abatement of impasse procedures. The bargaining unit in that case was not certified until January 6, 1976. Despite the fact that completion of impasse procedures was made impossible by the late certification, the Board, after "exhaustively re-examin[ing] the statute and [the] rationale in *Belmond,*" reaffirmed the guidelines enunciated in that earlier case. It again expressed doubts about the legislature's wisdom in establishing March 15 as a deadline, but it emphasized this quotation from *Belmond: "Despite these realities, they result from legislative action and are not ours to alter."* See also *City of Ottumwa,* PERB Case No. 727 (1976).

Then, on November 2, 1976, the Board issued a declaratory ruling in *Iowa Association of School Boards/Iowa State Education Association,* PERB Case No. 848 (1976), that abandoned the *Belmond* construction and decided that March 15 did not define the end point for statutory impasse procedures. *School Boards* discussed *Belmond* on a manner which suggested that the earlier case had gone beyond merely construing the Act to impose additional provisions not contained in the Act. It opined, however, that the decisions to abate impasse services in *Cedar Falls* and *City of Ottumwa* would be the same because commencement of bargaining in a timely manner was important and the requests to bargain in those cases came too late.

The requirement of a timely commencement of bargaining was further elucidated in *Iowa Western Community College and Iowa Western Community College Higher Education Association,* PERB Case No. 884 (1977). That case held that "there must be at a minimum some expectation that the process could be completed within the statutory impasse period."

Our focus now shifts from the Board back to the legislature. In 1977, the first round of collective bargaining with State employees had resulted in final settlements being reached quite late in the fiscal year, after completion of the regular legislative session. Therefore, on June 13, 1977, Governor Robert D. Ray called the General Assembly into extraordinary session for the purpose of acting on "salary increases and related benefits for state employees." *See* Proclamation, Senate Journal, Extraordinary Session, 67th G.A. 1–2. In addition to acting on salaries and benefits, the legislature added this subsection to § 20.17, The Code:

10. The negotiation of a proposed collective bargaining agreement by representatives of a state public employer and a state employee organization shall be complete not later than March 15 of the year when the agreement is to become effective. The board shall provide, by rule, a date on which any impasse item must be submitted to binding arbitration and for such other procedures as deemed necessary to provide for the completion of negotiations of proposed state collective bargaining agreements not later than March 15. The date selected for the mandatory submission of impasse items to binding arbitration shall be sufficiently in advance of March 15 to insure that the

arbitrators' decision can be reasonably made before March 15.

Section 20.17(10), The Code 1979. This new subsection took effect on July 10, 1977.

It was against this background that the Board issued its declaratory ruling in this controversy on August 23, 1977, and the district court reversed on January 9, 1978.

One event which occurred subsequent to the district court's ruling must be recounted. On March 20, 1978, chapter 1032 of the Acts of the 67th General Assembly, took effect. That chapter provided, in pertinent part:

Section 1. Notwithstanding the provisions of subsection one (1) of section twenty point twenty-two (20.22) of the Code for negotiations on collective bargaining agreements effective for the 1978–1979 fiscal year and for those public employers and certified employee organizations who have requested impasse procedures by April 15, 1978, the board shall upon request of either party have the power to arrange for arbitration which shall be final and binding on both parties. The definitions listed in section twenty point three (20.3) of the Code shall apply to this section.

This Act shall not render moot any litigation filed in the supreme court of Iowa prior to March 1, 1978, regarding the availability of impasse services under chapter twenty (20) of the Code.

I. *Propriety of Judicial Review.* Two preliminary issues which confront us are whether the district court was without power to decide this case because it was moot and whether the city has standing to seek judicial review of the Board's ruling.

A. *Mootness.* The mootness issue was first raised in the district court by the intervenor's motion to dismiss. That motion alleged that the labor dispute out of which the city's petition for declaratory ruling arose had been settled. The court, in its decision, recited as a fact that the underlying dispute had ended and that the case was moot. It expressed the opinion, however, that because the legislature intended for declaratory rulings authorized by § 17A.9,

The Code, to be the subject of judicial review, the court was probably authorized to consider the case. In any event, the court reasoned, the issue was of sufficient public importance to require judicial resolution and for that reason the court proceeded to the merits.

On this appeal the Board has adopted the intervenor's mootness contention. It too argues that mootness deprived the district court of the power to hear this case.

▮ The district court was correct in holding that while the case might be moot it was one which justified judicial action. The courts of this state may properly consider moot questions when they are of great public importance and are likely to recur. *See Catholic Charities of Archdiocese of Dubuque v. Zalesky,* 232 N.W.2d 539, 542–3 (Iowa 1973); *Danner v. Hass,* 257 Iowa 654, 659–60, 134 N.W.2d 534, 538–9 (1965). The issue presented here meets that dual standard.

▮ In addition, it is open to question whether mootness is an appropriate issue in this case. Section 17A.9 contemplates declaratory rulings by administrative agencies on purely hypothetical sets of facts. *See West Des Moines Education Ass'n v. PERB,* 266 N.W.2d 118, 121 (Iowa 1978); Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, The Rulemaking Process,* 60 Iowa L.Rev. 731, 822 (1975) [hereinafter cited as *Bonfield*]. And it provides that such rulings will be the subject of judicial review. *Cf. State Dept. of Health v. Barr,* 359 So.2d 503, 505 (Fla. App.1978) (construing similar provisions of Model State Administrative Procedure Act as enacted in Florida); *Bonfield* at 823–4; § 17A.19(1), The Code, (providing for appeal from "any final agency action"); § 17A.2(9) (defining agency action as including a "statement of law or . . . decision . . . "; a declaratory ruling under § 17A.9 is a final statement of law or decision).

Unlike the federal courts which are constrained by specific constitutional provisions, *see Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272, 277–8 (1975), mootness does not affect the *power* of a court of this state to act. Instead the refusal to rule on moot questions is a self-imposed rule of restraint.

The questions decided by administrative agencies under the § 17A.9 declaratory ruling process may be moot at their inception. But the importance and nature of the questions so decided will ordinarily justify foregoing judicial restraint to allow review by the courts of this state.

B. *Standing.* The Board challenges the city's standing to obtain judicial review. Its claims are that the city is not an aggrieved party within the meaning of § 17A.19(1) and that its substantial rights have not been prejudiced as required by § 17A.19(8). The standing provision of § 17A.19(1) is similar to § 15 of the Model State Administrative Procedure Act. In construing the Model Act provision, the Connecticut Supreme Court stated the test of standing thus:

> The fundamental test by which the status of aggrievement for purposes of qualifying to take an appeal from an administrative order or regulation is determined encompasses a well-settled twofold determination. First, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision.

*Nader v. Aldermatt,* 166 Conn. 43, 51, 347 A.2d 89, 94 (1974). *See also Local 1344, Council No. 4, American Federation of State, County and Municipal Employees v. Connecticut State Board of Labor Relations,* 30 Conn.Supp. 259, 260, 309 A.2d 696, 697 (1973); *Wisconsin's Environmental Decade v. Public Service Comm'n of Wisconsin,* 69 Wis.2d 1, 9–10, 230 N.W.2d 243, 247–9 (1975).

Standing under § 17A.19(1) might in some circumstances be more broad than suggested by this test. However, the city's position as a public employer enables it to meet the test's first part. And the fact that it will be involved in future negotiations affected by the decision of the Board in this matter establishes that its interest has been specially and injuriously affected. This demonstrates that the city is a party aggrieved by the Board's decision and thus entitled to maintain this action for judicial review.

Finally, the "substantial rights" language of § 17A.19(8) has no bearing on a person or party's standing to obtain judicial review. It is, instead, merely a provision analogous to a harmless error rule. It is a direction to the court that an agency's action should not be tampered with unless the complaining party has in fact been harmed. The city's future recurring involvement in contract negotiations also serves to meet this requirement.

II. *The Substantive Question.* Thus we arrive at the merits of the controversy. All involved agree that the question presented must be answered by discerning the legislature's intent. Did the legislature intend that the certified budget submission date for political subdivisions should be the end date for statutory impasse procedures?

The manner of judicial review of an administrative agency's construction of the statute which it administers was discussed in *West Des Moines Education Ass'n v. PERB,* 266 N.W.2d 118, 124–5 (Iowa 1978). While the court should give the agency's construction weight, it is not bound by that construction. The court is instead obligated to make an independent determination of the statute's meaning. One rule of construction which is of particular importance in making such an independent determination here is that which requires a consideration of all parts of the enactment without undue emphasis on any single portion. *First Nat'l Bank of Ottumwa v. Bair,* 252 N.W.2d 723, 725 (Iowa

1977); *Doe v. Ray,* 251 N.W.2d 496, 500 (Iowa 1977).

■ A. *The Legislature's Intent.* An examination of the entirety of the Public Employment Relations Act compels the conclusion that the legislature intended that collective bargaining should be completed on or before March 15, the certified budget submission date. This intent is manifested by the number, and by the pivotal importance, of references in the Act to the public employer's certified budget submission date. Further, it is consistent with all four purposes of the Act set forth in § 20.1 and absolutely essential to one of those purposes: the assurance of effective and orderly operations of government. ⸱

Budget certification is first mentioned in § 20.7(8), as part of the list of employer's rights. That subsection preserves the governmental entity's power to "[i]nitiate, prepare, certify and administer its budget." Next, the budget certification date is established as the reference point for timely initiation of negotiations by § 20.9, which provides that the parties shall commence talks "reasonably in advance of the public employer's budget-making process." Finally, the budget certification date is also established as the reference point for initiation of impasse procedures by §§ 20.19 and 20.-20. ⸱

Section 20.19 is not directly relevant to the instant case because it addresses the situation in which the parties have agreed upon impasse procedures. But, in such a situation, the agreement is required to provide for implementation of those procedures "not later than one hundred twenty days prior to the certified budget submission date of the public employer."

Section 20.20, however, is directly involved here. That section, which deals with procedures in the absence of an impasse agreement by the parties, commands the Board to initiate impasse procedures at any time within 120 days before the certified budget submission date upon the request of either party.

Thus it can be seen that the certified budget and its submission date weighed heavily on the collective legislative mind as it pondered the establishment of a timetable for collective bargaining. But to establish that the certified budget submission date was of critical importance to the legislature does not automatically yield the result that the budget submission date was intended to mark the mandatory terminal point for collective bargaining. That would be true only if such a construction "is essential to the main objective of the statute . . . ." *Taylor v. Department of Transp.,* 260 N.W.2d 521, 522–3 (Iowa 1977).

■ B. *The Mandatory Nature of the End Point.* It is necessary, then, to determine what is the main objective of the Public Employment Relations Act. This determination is made by reference to the prior state of the law, *Egan v. Naylor,* 208 N.W.2d 915, 918 (Iowa 1973), other circumstances surrounding the statute's enactment, *Smith v. Thompson,* 219 Iowa 888, 895, 258 N.W. 190, 195 (1935), consideration of statements of public policy found within the act, *In re Wiley's Guardianship,* 239 Iowa 1225, 1231, 34 N.W.2d 593, 596 (1948), and the entire text of the enactment. *In re Estate of Bliven,* 236 N.W.2d 366, 369 (Iowa 1975).

The prior law on public employment relations was set out in *State Board of Regents v. United Packing House Food and Allied Workers,* 175 N.W.2d 110 (Iowa 1970).

That case reaffirmed the right of public employees to organize and join labor organizations while also reaffirming the denial of a right to strike for these workers. The supreme court further established that public employers could meet and confer with groups of workers about compensation and working conditions. However, a firm line was drawn against the legality of recognition of an employee organization as the exclusive bargaining representative for an entire unit of employees. . . . The court made it clear that, "if the legislature desires to give public employees the advantages of collective bargaining in the full sense as it is used in private industry, it should do

so by specific legislation to that effect." (Footnotes omitted.)

*Pope,* 24 Drake L.Rev. 1–2.

█ The statute was enacted at a time when public employees in various states were disregarding prohibitions against strikes. *See* Dole, *State and Local Public Employee Collective Bargaining in the Absence of Explicit Legislative Authorization,* 54 Iowa L.Rev. 539–40 (1969). Such actions were causing disruptions in governmental services. Consideration of these circumstances indicates that a primary purpose in enacting the Public Employment Relations Act was to assure continued effective and orderly government operations. Impasse procedures, established by the Act to replace the strike as a means of achieving a balance of power and guaranteeing meaningful negotiations, are not the ends of the Act. Instead, they are merely the means by which the ends, labor peace and resultant efficient delivery of government services, are to be achieved.

An examination of the Act itself confirms this legislative purpose. The statement of public policy found in § 20.1, The Code, emphasizes harmonious labor relations and "effective and orderly operations of government," while recognizing the right of employees to join or refuse to join employee organizations. The legislative attitude toward collective bargaining, as evinced by the Act as a whole, has been described by one commentator as "permissive neutrality." *Pope,* 24 Drake L.Rev. at 11–13. There is no statement in the Act of a preference for collective bargaining. Again, the legislature has adopted collective bargaining not as an end, but as a means which it perceived to be necessary for maintaining effective and orderly government.

A construction of the Act which failed to recognize the certified budget submission date as a mandatory cut off for impasse procedures would be inimical to the purpose of the Act. Such a construction would make it impossible for a political subdivision to deal effectively with its duty to formulate a budget and carry out its provisions. The year-round bargaining which could result would only detract from the effective and orderly delivery of governmental services by political subdivisions.

III. *Other Arguments.* The Board and the intervenor have raised several arguments which have not been specifically dealt with, but which deserve individual attention. It is argued that the time requirements for the various impasse steps in §§ 20.20–.22 are directory and not mandatory. That is a question which we need not, and do not, decide. Our decision is based only on a recognition that the legislature has set a deadline by which impasse procedures must be completed. There is sufficient leeway between the time required to complete impasse procedures (66 days) and the time between the initiation reference point and the deadline (120 days) to allow for delays in the initiation of or in the process of impasse procedures. Whether the individual times set in §§ 20.20–.22 are directory or mandatory has no bearing on the result in this case.

The Board also claims that the result reached by the district court and now by this court has the effect of scrapping arbitration or excising it from the Act. There is no basis for this accusation. The conclusion reached here simply puts the burden on the party who will most likely feel the need for arbitration (generally the employee organization) to see that negotiation and impasse procedures are undertaken in a timely manner. There is nothing in the Act which forbids starting negotiations earlier in the year so as to assure that the issues are sufficiently formulated to make good use of the impasse procedures beginning in mid November. Nor is there anything in the Act which prevents the continuation of bargaining during the time that impasse procedures are in progress. In fact, § 20.22(2) contemplates such continued negotiation. Ultimately, the only impact which this decision need have on negotiations is to require that they be conducted earlier in the year.

Another claim made by the Board is that the budget of the public employer can be amended after its submission date to account for higher wages and benefits then expected. Section 384.18, The Code, is cited

for this proposition. But that section does not give the political subdivision employer the budgetary flexibility which the Board claims. The section allows a public employer to expend unanticipated money acquired after submission of the budget and to redistribute money among certain funds and programs. There is no authority in § 384.18 to increase revenues in order to meet a higher total obligation. Therefore, to satisfy wage and benefits costs which are higher than budgeted, § 384.18 merely allows the political subdivision employer to shift funds from other programs which were of sufficient merit to be included in the budget initially.

In this same vein, it is suggested that the public employer would find protection in §§ 20.22(9)(c) and (d) and 20.17(6). The first requires the panel of arbitrators to consider "the ability of the public employer to finance economic adjustments and the effect of such adjustments on the normal standard of services," and "[t]he power of the public employer to levy taxes and appropriate funds for the conduct of its operations." Section 20.17(6) forbids enforcement of an agreement or arbitration decision if it is inconsistent with a statutory limit on the employer's finances or would impair the performance of a duty imposed upon the employer by statute.

But neither of these provisions gives the public employer the protection which is contended for. Section 20.22(9)(c) and (d) merely set out two factors for the arbitration panel to consider. Those factors are only guiding principles, and not limits on the panel's powers, violation of which would require abrogation of a decision. And because the factors set out are of importance in an arbitration panel's considerations when conducted prior to March 15, it cannot be argued that our reading of the statute renders these portions of it purposeless.

Section 20.17(6) has limited usefulness because it can be invoked only where statutory limitations or duties are breached. Thus it would not protect a political subdivision from being forced to withdraw funds from programs not required by statute and use them for increased wages and benefits. This reading of the section is reinforced by a consideration of the likely reaction of an employee organization which discovers that the contract which it had gained has been nullified. See Pope, 24 Drake L.Rev. at 40. The employee hostility and tension which would result from such an action is precisely the sort of problem which the Act was intended to avoid.

Next, we are called upon to account for the presence in the Act of § 20.17(10), set out above. The Board argues that the absence of an analogous section applying to political subdivisions is proof of the legislative intent to allow bargaining and impasse to go beyond March 15 where a political subdivision is the employer. The circumstances out of which this subsection arose have been discussed. Its purpose is not to impose a deadline for state negotiations while leaving political subdivision negotiations open-ended. Rather, it was a recognition that the deadline of March 15 imposed on political subdivision negotiations did not apply to the state because there is no certified budget submission date for state agencies. The date, March 15, could have no other significance. Thus understood, the presence of § 20.17(10) buttresses our understanding of the Act. It was an attempt to establish uniformity of procedure between state and political subdivision negotiations. It stands as a legislative rejection of the arguments against enforcement of a mandatory end point for negotiations.

Finally, we may give consideration to the meaning of chapter 1032 of the Acts of the 67th General Assembly. Subsequent legislative action on a subject can assist in discerning the meaning of a statute. See Domain Industries v. First Security Bank & Trust Co., 230 N.W.2d 165, 168 (Iowa 1975). This provision is simply the legislature's method for providing relief to employee organizations which had depended upon the Board's construction of the Act. Because the district court's decision came late in the 1977–78 bargaining season, considerable prejudice might otherwise have resulted.

In conclusion, three additional points should be made. First, we deal here with statutory impasse procedures and not proce-

dures negotiated by the parties under § 20.19. Second, the facts upon which this opinion is based establish that the parties were negotiating in good faith. There is no suggestion of attempts by either side to create delay and make completion of impasse procedures before March 15 impossible. Third, we are not considering a case where unavoidable casualty, misfortune or other events beyond the parties' control have prevented timely completion. Upon such facts, the result might well be different.

AFFIRMED.