CITY OF DUBUQUE, Appellant,

v.

PUBLIC EMPLOYMENT RELATIONS BOARD, Appellee.

No. 69040.

Supreme Court of Iowa.

Oct. 19, 1983.

Barry A. Lindahl, City Sol., Dubuque, for appellant.

Thomas J. Miller, Atty. Gen., Julie Pottorff, Asst. Atty. Gen., M. Sue Warner, PERB Counsel, and Steven F. McDowell, PERB Deputy Counsel, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and McCORMICK, McGIVERIN, CARTER, and WOLLE, JJ.

REYNOLDSON, Chief Justice.

The fighting issue in this case, one of first impression for this court, is whether the terms of a collective bargaining agreement should be applied to a large, functionally dissimilar group of employees amended into the bargaining unit too late to be included in the mandatory bargaining process. The Public Employment Relations Board (board) determined these workers were covered by the agreement although not included in its terms. Consequently, it found the employer, City of Dubuque, in violation of two provisions of the Public Employment Relations Act on the basis of two prohibited practice complaints filed by

the International Union of Operating Engineers (union). The city sought review in district court, which affirmed in part and reversed in part. The city appealed and the board cross-appealed from the district court ruling. We reverse.

The facts are virtually undisputed. In 1975 the board certified the union as the exclusive bargaining representative for the city's employees in the waste water treatment plant and water division. The classifications included plant mechanics, maintenance electricians, equipment mechanics, equipment operators, plant operators (certified and noncertified), assistant plant operators, meter repair workers, maintenance workers, meter inspectors, meter service workers, meter readers, truck drivers, custodians and laborers.

August 6, 1979, the union filed a petition with the board (supplemented by the city's stipulation) to amend the unit by adding an approximately equal number of employees in the following classifications: street department account clerks I and II; police department clerk typist, parking meter checker, dispatcher; public parking department ramp cashier, head ramp cashier; building department custodians I and II, inspector I, clerk typist; finance department account clerk I, senior cashier, cashier, clerk. This petition of course was subject to the board's statutory investigation and to an election pursuant to Iowa Code sections 20.13–.15 (1979).

Meanwhile, the union and the city began negotiations relating to the then represented employees in the fall of 1979, for the fiscal year 1980–81 contract. Evidently there was an impasse that proceeded through mediation and fact-finding, for the record reflects each party submitted a section 20.22(2) final offer on February 21, 1980. The arbitration hearing was held February 28, 1980. The arbitration award for the 1980–81 contract was filed March 13, 1980, two days before the section 20.-17(10) March 15 deadline.

The board did not file its order certifying and designating the union as exclusive representative of the employees in the last-described classifications until February 19, 1980, just two days before the city and union submitted final offers in the impasse proceedings. Although there had been some discussion of the status of these prospective union members, the union had made no proposals as to them. As the contract proceeded to arbitration, the city offered to extend the wage package of the contract to the amended classifications if the union would accept the city's final offer. This proposal was refused.

It was evident the union acquiesced at that time with the city's position it was too late to work out contract provisions for the new union members. In his opening statement before the board's hearing officer the union's representative stated:

We also agreed with the city at that time that when the certification came down from the State, which was February 19, 1980, that it was impossible for us to put an economic package together, go through the rules of negotiation, and possibly some impasse procedures; it was too late to have any economic relief for them by March 15, the deadline.

The representative's further statements that the union claimed the non-economic contract provisions would apply, the city's denial of this effect, and the city's subsequent failure to follow through on its proposal to print the rules governing employees not covered by contract all have support in the record.

The 1980–81 contract, as examined and signed by the union and city, contained no reference to the newly represented employees. The "Preamble" provides:

This Agreement is made and entered into this First day of July, 1980 by and between . . . the City and the Union on behalf of the employees in the Bargaining Unit, recognized and described under "Recognition Provision" of this Agreement.

Article I of the agreement is entitled "Recognition." It itemizes only those employees in the classifications we first enumerated above, and mentions none of the newly represented employees. The detailed and care-

fully drafted wage plan does not include their classifications. Several other contractual provisions obviously were designed to apply only to the employees initially represented.

In October of 1980, the union requested bargaining over the new classifications. The city agreed to bargain, but only over terms of the new contract to commence July 1, 1981. Specifically, and perhaps inconsistently, the union then contended a discharged employee's position was covered by the 1980–81 contract making her entitled to its grievance procedures.

November 13, 1980, the union filed a prohibited practice complaint with the board, protesting the city's refusal to bargain in violation of Iowa Code sections 20.10(2)(a) (interference with public employee rights), 20.10(2)(e) (refusal to negotiate collectively), and 20.10(2)(f) (denial of certification rights).

January 9, 1981, the union filed a second complaint alleging city violation of the same sections. This charge was based on the city's failure to process the grievance of one of the newly represented employees who was discharged on October 31, 1980.

These two complaints were consolidated for hearing. The board's hearing officer found for the union on both, concluding the "amended employees should have been covered under the current unit contract from the time of their amendment." The hearing officer thus determined "that the City's refusal to implement the contract for those employees and refusal to process the grievance of a discharged employee, constitutes a denial of the rights accompanying certification and a refusal to bargain collectively, in violation of Sections 20.10(2)(e) and (f) of the act." The refusal to implement the contract provisions for the amended employees was declared a prohibited act and the city and union were ordered to meet with a board representative within fourteen days for the purpose of constructing an appropriate remedy.

On appeal the board affirmed the hearing officer's recommended decision. Its decision expanded on the prior ruling by making more clear that it "preserv[ed] for both labor and management the ability to bargain matters which are 'not covered by the existing contract' and which are of unique concern to the affected positions." Further:

[B]argaining can be compelled on any contract clause which cannot be appropriately applied to the amended unit positions. Thus, attempts to seek exclusions or adjustments in the existing clauses must be predicated upon specific conditions of employment unique to the amended unit positions. Failing to reach a bargained agreement, either side could utilize the impasse procedures when they next become available.

In its affirmance the board made no provision for remedial measures beyond that contained in the hearing officer's ruling.

The city petitioned for district court review. The court affirmed the board's ruling the amended employees were entitled to instantaneous coverage and the city's refusal to negotiate over contract coverage in the fall of 1980 was a prohibited practice. The city appeals from that finding. The district court further determined that the city's refusal to process the discharged employee's grievance was a contract dispute, not a prohibited practice, and thus was cognizable only in district court. Finally, the court found the board's order that the two sides meet to construct an appropriate remedy exceeded the board's remedial authority under Iowa Code section 20.11(4) ("the board may, within thirty days of its decision, enter into a consent order with the party to discontinue the practice, or petition the district court for injunctive relief"). Reasoning that the board had taken neither of the authorized steps within the prescribed period, and that the newly represented employees then were covered by the 1981–82 contract, the district court held this issue moot.

The city appealed and the board cross-appealed. Of the several issues raised, we need treat only the questions of mootness and of whether the newly represented em-

ployees, as a matter of law, were included in the 1980–81 contract.

## I. *Scope of Review.*

██ The scope of our review is governed by Iowa Code section 17A.19 (1983), see *Jackson County Public Hospital v. Public Employment Relations Board,* 280 N.W.2d 426, 429 (Iowa 1979), and this court's sole duty "is to correct errors of law made by the district court." *Foods, Inc. v. Iowa Civil Rights Commission,* 318 N.W.2d 162, 164–65 (Iowa 1982). Although this court gives some weight to the board's interpretation of its own mandate, it is not bound by its conclusions and must make an independent assessment of the meaning of the statute. *See Charles City Community School District v. Public Employment Relations Board,* 275 N.W.2d 766, 769 (Iowa 1979); *City of Des Moines v. Public Employment Relations Board,* 275 N.W.2d 753, 759 (Iowa 1979); *West Des Moines Education Association v. Public Employment Relations Board,* 266 N.W.2d 118, 124 (Iowa 1978); *Sullivan v. Iowa Departmental Hearing Board,* 325 N.W.2d 923, 925 (Iowa App.1982).

## II. *Mootness.*

██ The fact the newly represented employees were included in the following year's 1981–82 contract does not necessarily preclude court consideration of the city's 1980–81 contract. Ordinarily we consider a case moot if the issues have become academic so that judgment, if rendered, will have no practical legal effect upon the existing controversy. *State v. Wilson,* 234 N.W.2d 140, 141 (Iowa 1975). Here, however, the issues may not be academic. The board's brief asserts that "whatever monetary benefits might have been lost to employees by the city's failure to apply the general contractual provisions may be properly restored," citing *Maquoketa Valley Community School District v. Maquoketa Valley Education Association,* 279 N.W.2d

510, 512–13 (Iowa 1979). The board suggests the city's failure to accord the discharged employee the contractual grievance procedure may be remedied "by an injunction permitting present access to a grievance procedure applying the substantive terms of the 1980–81 collective bargaining agreement."

██ Without endorsing either of those proposals as legally permissible remedies, we nonetheless conclude the underlying issue should be determined. Even if the question of prior contract coverage is moot, we may still consider it if it is of great public importance and likely to recur. *See Department of General Services v. R.M. Boggs Co.,* 336 N.W.2d 408, 410 (Iowa 1983); *Polk County v. Iowa State Appeal Board,* 330 N.W.2d 267, 271 (Iowa 1983). This issue may recur and clearly is important as its resolution may impact the employment relations of governmental units and numerous employees. We shall consider the question under the public interest exception. *See Rush v. Ray,* 332 N.W.2d 325, 327 (Iowa 1983).

## III. *Contract Coverage.*

The hearing officer's ruling, adopted by the board, followed the dissenting position in *Federal-Mogul Corp.,* 209 N.L.R.B. 343, 85 L.R.R.M. (BNA) 1353 (1974). That decision brings into focus the opposing views advanced in this controversy.

In *Federal-Mogul* approximately 140 "setup" employees had been amended into a unit of about 2000 production and maintenance workers belonging to the United Auto Workers Union. This resulted from what in labor parlance is termed a "Globe" election.[1] The employer then unilaterally determined the setup employees were governed by the current agreement with the original unit. As a consequence these employees were stripped of certain benefits. When the employer refused to restore the

1. A "Globe" election takes its name from Globe Machine & Stamping Co., *3 N.L.R.B. 294 (1937). It permits the voting employees to choose to be affiliated not only with a specific*

*union but also with a specific bargaining unit. See R. Gorman, Basic Text on Labor Law Unionization and Collective Bargaining 72 (1976).*

benefits, the union filed an unfair labor practice charge, alleging a failure to bargain in good faith and interference with the "Globed" employees' organizational rights.

The union prevailed when the majority of the National Labor Relations Board reasoned that extending immediate coverage to the "Globed" employees would force both them and their employer into a contract never contemplated by either. This, the majority concluded, would violate the doctrine of *H.K. Porter Co. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), holding that the parties should not be forced into contractual responsibilities they had no opportunity to negotiate.[2]

The majority in *Federal-Mogul* found its result would promote bargaining stability, since the minority view would require both parties to make agreements for groups of employees whose number and identity would be totally unknown to, and unpredictable by, either party. Projected costs of wages and benefits would become equally unpredictable, as would the hazards and reach of health and pension plans. In a "Globe" election involving competing unions, the unions would be placed in disparate positions, as the voters would know the precise terms of the contract negotiated by the incumbent union, although neither union would have reached a bargain with the employer for the new group.

The *Federal-Mogul* majority preferred separate interim bargaining for the newly represented employees:

> We believe this is what is needed to be bargained here, and that such bargaining is to be preferred, both legally and practically, over automatically fitting the new group, sans bargaining, into a fixed mold no matter how badly that mold may fit either the employees' or the employer's

circumstances, needs, and desires at the time.

209 N.L.R.B. at 345, 85 L.R.R.M. at 1355.

The two dissenting members concluded the "Globed" employees were voting not only for an existing union representative but also for an existing union contract. Thus, "the provisions of [the existing] contract apply automatically and equally to all individuals in the unit, including those who are newly included." *Id.* at 346, 85 L.R.R.M. at 1356. The benefits and working conditions of the setup persons should be derived exclusively from the production and maintenance contracts, although, in the opinion of the minority, the employer had a limited post-election duty to bargain on items not included in the contract that were of unique concern to the setup employees.

In the case before us, the minority position was adopted by the hearing officer and the board as the prime authority for holding against the city. The board found application of the majority rule in *Federal-Mogul* would cause inordinate delay in securing the benefits of collective bargaining for the newly represented employees under the Iowa Public Relations Act. It cited *Des Moines Education Association,* PERB No. 516 (1975), as holding the Iowa law contemplates that the parties bargain prospectively for the fiscal period to be covered by the concurrent budget-making process. See *City of Des Moines,* 275 N.W.2d at 760. In contrast, in the private sector the duty to bargain applies immediately.

The reviewing district court made no recourse to *Federal-Mogul.* It simply found that the final 1980–81 contract, of necessity, had to be interpreted in light of the board's unit certification, because any unit, including an expanded one, is by nature indivisible.

---

**2.** The *Porter* Court wrote:

The Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself. One of these fundamental policies is the freedom of contract. While the parties' freedom of contract is not absolute under the Act, allowing the Board to compel agreement

when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract. *Id.* at 108, 90 S.Ct. at 826, 25 L.Ed.2d at 153.

Other decisions in this area are few in number, distinguishable on their facts, and varying in their results. *See NLRB v. Abex Corp.,* 543 F.2d 719 (9th Cir.1976) (functional similarity in the two groups of employees made it logical for all to be covered by the existing contract); *Franklin Central School v. Franklin Teachers Association,* 51 N.Y.2d 348, 414 N.E.2d 685, 434 N.Y.S.2d 185 (1980); *Port of Portland v. Municipal Employees, Local 483,* 27 Or.App. 479, 556 P.2d 692 (1976).

■ We hold, with the majority in *Federal-Mogul,* that in these circumstances the newly represented employees cannot be accorded automatic coverage by the existing contract. It is anomalous to say the city should be forced to accept under the terms of the contract an additional and functionally dissimilar group of employees that doubled the unit, even though the city and the union both conceded in bargaining the new group was brought in too late to be included. It would be even more anomalous in these situations to say that the newly represented members must be bound by a contract negotiated without them. We do not believe, as the *Federal-Mogul* minority opinion suggests, that the employees voting in a "Globe" election ordinarily realize they are voting to be governed by an existing contract. It is more reasonable to suppose they only understand they are voting for representation by a union, and possibly for inclusion in an existing unit. There is nothing in the record before us to indicate the amended employees in this case were at any point in the election process informed they would be bound by a current contract.

Certainly forcing public employers to negotiate terms and conditions of employment for units that could undergo significant changes during the life of the contract does not assure "effective and orderly operations of government," one of the stated policies behind the Public Employment Relations Act. See Iowa Code § 20.1. Although units may also change through unit classification proceedings, see R. Gorman at 70, and through accretion, see *id., NLRB v. Don Burgess Construction Corp.,* 596 F.2d 378,

387 n. 5 (9th Cir.), *cert. denied,* 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979), neither of these events occur without some preceding affirmative action by management. Thus, these processes are less destructive of orderly government operations.

The inherent problems in attempting to bring these newly represented employees within the 1980–81 contract are illustrated by the ambivalence in the board's decision. The hearing officer's decision that the board affirmed was described as concluding "that the employees amended into the unit should be immediately covered by the collective bargaining contract," yet no one has suggested the 1979–80 contract in force when the board's certification was issued would apply. At one point the board's decision holds the contract terms should be applied to the amended employees; at a later point it holds "bargaining can be compelled on any contract clause which cannot be appropriately applied to the amended unit positions." This mandated interim bargaining concept is at war with an earlier statement in the decision that " 'interim bargaining' as envisioned by the majority in *Federal-Mogul* clearly cannot be required without contradicting our ruling in *Des Moines Education Association.*" In addition, it is inconsistent with the limitation found in Iowa Code section 20.17(7):

> *If agreed to by the parties* nothing in this chapter shall be construed to prohibit supplementary bargaining on behalf of public employees in a part of the bargaining unit concerning matters uniquely affecting those public employees . . . .

(Emphasis added.)

The teaching of our own decisions and decisions of the board is that the PERA must be administered in light of the fact that public employers undergo structured, public, closely scrutinized budgeting and tax levying procedures that necessitate *prior* finalized collective bargaining agreements. Unlike private employers, public institutions operate on tax revenues generated annually or biannually out of these procedures.

The act contemplates that the financial obligations of the employers be fixed by March 15—the certified budget submission date of the public employer. *See* Iowa Code §§ 20.17(10), 20.19. This requirement excludes the freedom of year-round bargaining, as we pointed out in *City of Des Moines,* 275 N.W.2d at 761:

> A construction of the Act which failed to recognize the certified budget submission date as a mandatory cut off for impasse procedures would be inimical to the purpose of the Act. Such a construction would make it impossible for a political subdivision to deal effectively with its duty to formulate a budget and carry out its provisions. *The year-round bargaining which could result would only detract from the effective and orderly delivery of governmental services by political subdivisions.*

(Emphasis added.) In the past, upon proper application of the public employer, the board has terminated impasse procedures where the employee organization has been certified so late there could be no reasonable expectation the process could be completed within the statutory impasse period. *See Iowa Western Community College,* PERB No. 884 (1977) (employee organization certified January 14, 1976); *City of Cedar Falls,* PERB No. 712 (1976) (employee organization certified January 6, 1976). In the latter decision the board wrote:

> We are also mindful that there are unique characteristics about public sector bargaining that must be recognized and dealt with realistically.
>
> One of these realities is that there must be an end to the process of contract bargaining, and that as a matter of law government budgets must be compiled, fiscal policy determinations made and budgets certified. . . . [I]n the first year of certification of a bargaining unit, the bargaining unit may simply be too late to complete the process for that given bargaining year.

In this case the union, like the employee organizations in the two board decisions cited above, obtained certification too late to permit implementation of the three-tiered procedure for reaching a final contract before the March 15 cut off. Both the union and the city seemed to concede this at the time.

■ It follows that because the discharged employee was not covered by the contract, the contract grievance procedures were not available in her case. This does not mean that the union could not represent her in any disciplinary conferences[3] with the employer, or in any voluntary bargaining the employer would engage in.

■ Nor was the city guilty of a prohibited practice in refusing, in the fall 1980, to negotiate for coverage of these newly represented employees under the 1980–81 contract. The window of time for such bargaining was closed March 15, 1980. The hearing officer found the city stood willing to negotiate regarding contract coverage for such employees for the period commencing July 1, 1981.

The result we reach in this case is supported by our analysis that Iowa Code chapter 20 establishes a public policy against year-round contract negotiations. With the exception of the state and its employees, see section 20.15(6), chapter 20 lends itself and its procedures to annual negotiations leading to final terms by March 15. Whether the policies we find controlling in the one-year contract situation before us would apply to exclude annual contract changes in multi-year contracts where there is an interim amended bargaining unit will be determined when we confront such a case.

---

**3.** The city finally refused access to the contract grievance procedure in a document that stated "the position of Parking Meter Checker is not represented by the Union until July 1, 1981; therefore, the Union does not have authority to present a grievance on her behalf." We reject the implication that the union could not represent these employees as soon as certified. The fact this occurred too late to bargain them into the next contract does not mean these employees are not represented by their union.

Our holding on the above two issues removes any requirement to address the other issues the parties raise. This case is remanded to district court for further proceedings in conformance with this opinion.

REVERSED.