## STATE SYSTEM OF HIGHER EDUCATION, Petitioner

v.

## ASSOCIATION OF PENNSYLVANIA STATE COLLEGE & UNIVERSITY FACULTIES, Respondent.

Commonwealth Court of Pennsylvania.

Resubmitted on Briefs Jan. 28, 2002.

Decided May 6, 2002.

As Amended May 9, 2002.

Joseph F. Quinn, Pittsburgh, for petitioner.

Elliott A. Strokoff, Harrisburg, for respondent.

PER CURIAM.

The State System of Higher Education (Employer) appeals from a decision of an arbitrator (Arbitrator) determining that the Collective Bargaining Agreement (CBA) between Employer and Association of Pennsylvania State College & University Faculties (Union) covers 12 non-faculty athletic trainers [1] added to the bargaining unit, and that the terms and conditions for the 30 athletic trainers already performing the same work as the newly added non-faculty trainers in the CBA apply to the 12 non-faculty trainers.

The Union represents faculty members of the Employer in a bargaining unit of professional employees, including athletic

---

1. The 12 athletic trainers newly added to the Union will be referred to as the non-faculty athletic trainers.

trainers. While most of the athletic trainers have historically been considered faculty members, there were a group of 12 to 15 trainers who were not faculty members, were not considered part of the bargaining unit, and were classified as non-union. In 1997, both the Union and the State College & University Professional Association (SCUPA) filed unit clarification petitions seeking to include those non-faculty trainers in their bargaining units of professional employees. On October 19, 1999, the Pennsylvania Labor Relations Board (PLRB) issued a Final Order finding that the Union shared a community of interest with the non-faculty athletic trainers, and that its certification would be "amended to include athletic trainers, with and without faculty status."

On October 20, 1999, the Employer and Union agreed on a new CBA that included a clause defining "faculty" as the members of the bargaining unit but, not surprisingly, did not mention the non-faculty trainers because the PLRB's decision including them in the bargaining unit was issued the day before. The agreement was ratified by the Employer on November 19, 1999, and formally signed on January 13, 2000. On December 16, 1999, the Union wrote to the Employer requesting a meeting to implement the Final Order and to apply the CBA to the non-faculty trainers to which the Employer replied to the Union on January 10, 2000, stating that it wished to negotiate separate working conditions for the non-faculty trainers.

On March 31, 2000, Employer filed an unfair labor practice charge against the Union charging that it committed an unfair labor practice by refusing to bargain over the wages, hours and working conditions for the non-faculty trainers, and on May 10, 2000, the Union filed its own unfair labor practice charges alleging that the Employer improperly refused to apply the existing CBA to the non-faculty trainers. The Union also filed two grievances; the first objected to the Employer's refusal to apply the CBA to the non-faculty trainers and the second pertained to tuition reimbursement under the CBA for an individual non-faculty trainer employee. The PLRB deferred the Union's unfair labor practice charge to arbitration in light of the pending arbitration of the Union's two grievances and refused the request to defer the Employer's charge,[2] but stated that it would hold a hearing on the Employer's charge on written request which was not made.

A hearing was conducted by the Arbitrator who determined that the Employer had to apply the terms and conditions of the existing CBA to the non-faculty trainers, and the Employer had to make the individual grievant whole for all eligible tuition payments. Specifically, the decision held that: (1) the CBA covered all members of the bargaining unit, (2) the PLRB held that the 12 athletic trainers were in the bargaining unit, and (3) the CBA already contains the terms and conditions of employment for the 30 athletic trainers that were already performing the same work as the newly added non-faculty trainers. This appeal followed.

The method by which a court is to review arbitration awards as mandated by Section 903 of the Pennsylvania Public Employe Relations Act (PERA)[3] was set forth by our Supreme Court in *Employer of Higher Education (Cheyney Univ.) v. State College University Professional As-*

---

**2.** Only a charge filed by a party that has also filed a grievance may be deferred. Because the Employer did not file a grievance, the request to defer its charge was denied.

**3.** Act of July 23, 1970, P.L. 563, as amended, 43 P.S. §§ 1101.101–1101.2301.

*sociation*, 560 Pa. 135, 743 A.2d 405 (1999). It stated that:

> [A] reviewing court will apply a two-prong analysis. First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

The Employer contends that the Arbitrator's decision is incorrect under both prongs of the *Cheyney* analysis in that he neither had jurisdiction to hear the matter nor was his decision derived from the terms of the CBA.

As to whether the matter was embraced by the CBA which gives an arbitrator jurisdiction to hear the matter, the Employer contends that the Arbitrator erred when he found that the matter was subject to arbitration because at the time the contract was negotiated,[4] none of the parties knew that non-faculty athletic trainers had any knowledge that they would be part of the unit.[5] While acknowledging that the Employer is to make certain decisions about job responsibilities and job placement that are outside the scope of the CBA, the Union contends that it does not have to bargain over terms and conditions for non-faculty trainers on issues already covered under the CBA, such as tuition waiver which is the subject of the second grievance.

The issue of whether the Arbitrator has jurisdiction, in effect, determines the outcome of the unfair labor charges that the PLRB deferred to grievance-arbitration. Whether the PLRB should have deferred resolution of those charges pending outcome of the grievances is problematic because what is involved is more than just an interpretation of a contract but an interpretation of PERA on this issue: When a newly added group becomes part of a bar-

---

4. The CBA provides that "[i]f there is a question as to whether the arbitrator has jurisdiction to hear a case, this question must be heard and an immediate bench ruling issued by the arbitrator prior to his/her hearing and deciding the merits of the case."

5. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), gives the district courts jurisdiction to resolve disputes relating to collective bargaining agreements, including disputes as to whether a matter is subject to mandatory arbitration, and to enjoin arbitration if not subject to arbitration. *See also AT & T Technologies v. Communications Workers*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *United Steelworkers of America v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior and Gulf Navigation Company*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers of America v. American Manufacturing Company*, 363 U.S. 564, 80 S.Ct. 1363, 4 L.Ed.2d 1432 (1960), which rely on 29 U.S.C. § 185(a) to determine that controversies in the private sector relating to collective bargaining agreements are for the courts to determine. Under PERA, though, whether an item is embraced by a collective bargaining agreement, unlike in the federal system, that issue is first decided by an arbitrator; on appeal, in deciding whether to uphold the arbitrator's decision that a matter is embraced by arbitration, the reviewing court, "consistent with federal law, still has full and independent powers to review collective bargaining agreements after the arbitrator has ruled on whether a matter is subject to arbitration." *Chester Upland School District v. McLaughlin*, 655 A.2d 621, 636 (Pa.Cmwlth. 1995), *aff'd*, 544 Pa. 199, 675 A.2d 1211 (1996).

gaining unit that is already governed by a CBA, is the union or the employer required to bargain over the terms and conditions of their employment? If, as a matter of law, the agreement applies to newly added employees, the arbitrator has jurisdiction; if not, the arbitrator does not have jurisdiction to hear the matter.

There are no Pennsylvania cases and not many reported cases, especially recent ones, that deal with this issue. In *Howell Educational Secretaries Association v. Howell Public Schools*, 130 Mich.App. 546, 343 N.W.2d 616, 618–620 (1983), the Michigan Court of Appeals addressed an almost identical issue and gave an overview of the law of this area in determining whether an existing collective bargaining agreement applies to employees added to a collective bargaining unit. In that case, a bargaining unit represented by the union was comprised of secretarial and clerical employees; a representation election was conducted by food service and para-professional employees employed by the school board whose duties were not similar to those of the secretarial and clerical employees. The union took the position that non-economic terms contained in the existing CBA should have automatically been applied to the newly added group. The school board contended that none of the terms of that agreement automatically applied to those employees. The union ultimately filed an unfair labor practice charge with the Michigan Employment Relations Commission (MERC) claiming that the school board's refusal to automatically apply any of the terms of the collective bargaining agreement constituted an unfair labor practice which MERC upheld. In reversing MERC, the Michigan Supreme Court explained the status of the then-existing law and reasoned:

> [T]he narrow issue presented in this case is whether an exception to the rule exists where a newly added group becomes part of a bargaining unit which is already governed by a collective bargaining agreement where the newly added group does not perform the same duties as those employees who previously comprised the bargaining unit.

\* \* \*

The leading NLRB decision with respect to this issue is *Federal–Mogul Corp., Bower Roller Bearing Div. [v. Intern. Union, United Auto., Aerospace and Agr. Implement Workers of America]*, 209 N.L.R.B. 343 (1974). In *Federal–Mogul, supra*, it was the employer which unilaterally applied the terms of a previously negotiated collective bargaining agreement to the newly accreted group of employees. In ruling that the employer's action constituted an unfair labor practice, the NLRB stated the following:

> "We do not perceive either legal or practical justification for permitting either party to escape its normal bargaining obligation upon the theory that this newly added group must somehow be automatically bound to terms of a contract which, by its very terms, excluded them.

\* \* \*

> "Our decision promotes bargaining stability, since a major consequence of the opposite view would be that in contract negotiations both parties would be held to be making agreements for groups of persons whose identity and number would be totally unknown to, and unpredictable by, either party. Costs of wages and benefits under negotiation would thus become equally unpredictable, and informed negotiation of such benefits as health and pension plans would become well-nigh impossible. The unpredictable scope of the number,

age groups, and other factors of coverage which are essential to develop cost data as to such items would leave negotiators in the dark as to how to make any reliable estimates of future costs. Bargaining under such conditions would be seriously handicapped.

"This points to another element of unfairness inherent in Respondent's position ... [It]would create the only situation in law known to us in which individuals theretofore not a party to an agreement could, by their own unilateral action, vote themselves a share of the bargain which the other parties had agreed to between and for themselves." *Federal–Mogul, supra,* p. 344. (Footnotes omitted.)

"The decision in *Federal–Mogul, supra,* was subsequently followed by the NLRB in *Abex Corporation–Aerospace Division & Oil, Chemical & Atomic Workers International Union, AFL–CIO,* 215 NLRB 665 (1974). *See also Henry Vogt Machine Co. & United Steelworkers of America, AFL–CIO–CLC,* 251 NLRB 363 (1980). Although the NLRB decision in *Abex Corp, supra,* was overturned in *National Labor Relations Board v. Abex Corp–Aerospace Div.,* 543 F.2d 719 (C.A.9, 1976), the Court in that case drew a distinction between the situation presented therein and that which was involved *in Federal–Mogul, supra:*

"Without expressing any opinion concerning the correctness of the Board's decision in *Federal–Mogul Corp.,* we decline to follow it here in view of the specific factual circumstances presented in this case. As was true in *Federal–Mogul,* a sufficient 'community of interest' was found between the originally excluded employees and those represented by an existing unit to permit the holding of a Globe election. In addition, however, in this case, the

Regional Director found that the work performed by the excluded salaried employees was 'functionally similar' to that performed by certain employees within the existing bargaining unit. No such finding was evident in *Federal–Mogul* where the excluded employees were set-up men who prepared and checked machines for others to operate. Because only differences in fringe benefits and in some instances pay were involved while the services rendered by the employees included in the represented unit at the time the existing contract was adopted and those included as a result of the Globe election were nearly identical, we find the reasoning of the dissent as applied to this case persuasive and therefore deny the enforcement of the Board's order." 543 F.2d 721. *See also Universal Security Instruments, Inc. v. National Labor Relations Board,* 649 F.2d 247, 255 (C.A.4, 1981).

In the present case, as noted earlier, the duties performed by the newly accreted groups were not similar to those performed by the secretarial and clerical workers already within the bargaining unit. Therefore, since we find the reasoning expressed in *Federal–Mogul, supra,* to be persuasive, we hold that the School Board did not commit an unfair labor practice by refusing to automatically apply these terms to the newly accreted group.

*See also City of Dubuque v. Public Employment Relations Board,* 339 N.W.2d 827 (Iowa 1983).

Under the Michigan Court of Appeals analysis, which we adopt, if the duties of non-faculty trainers were substantially similar to those of faculty athletic trainers, then the terms of the CBA would apply and, if not, negotiation of a new contract

would apply. In this regard, based on the PLRB's findings, the Arbitrator found that:

> The overwhelming evidence presented into the record, particularly the record of the PLRB hearing before the Hearing Examiner during which numerous faculty athletic trainers and non-faculty athletic trainers testified as to their respective duties, wages, qualifications, and so forth, coupled with the language of the collective bargaining agreement defining the term "faculty," leads me to conclude that there is no significant difference between the faculty athletic trainers and the non-faculty athletic trainers, other than the term "faculty." By the fact of their inclusion into the bargaining unit, the non-faculty athletic trainers become faculty athletic trainers. The record revealed that of the approximately thirty existing faculty athletic trainers, some have faculty status and some do not have faculty status. *It is not clear exactly what "faculty status" means, however, the fact that the non-faculty athletic trainers are now, by contractual definition, faculty athletic trainers, such does not mean they have faculty status.*

> As the Association already bargained terms and conditions of employment for the existing faculty athletic trainers, and the non-faculty athletic trainers are now, by contractual definition, faculty athletic trainers, they obviously fall under the provisions of the collective bargaining agreement. *It is presumed that the parties will now meet to discuss how the clarified faculty athletic trainers will be incorporated into the collective bargaining agreement (wage classification, seniority, etc.).* It is understood that the terms and conditions of their employment will be the same as those similarly situated athletic trainers already under

the collective bargaining agreement. (Emphasis added).

The Arbitrator's decision is somewhat contradictory because he finds for purposes of the contract that non-faculty trainers are the same as faculty trainers; then, in the next sentence, he finds that they do not have faculty status. As to whether the CBA applies, he finds, relying on the hearing before the PLRB on the unit clarification, that non-faculty and faculty trainers are the same which would indicate that they should just be melded into that existing unit. But then he states that the parties will meet and presumably negotiate wages and seniority and the like even though he has found that the existing CBA applies.

To determine whether the first prong set forth under *Cheyney*, has been met, there has to be a clarification as to the difference between "faculty status" and "non-faculty" status and a determination as to whether there is a substantial difference between faculty and non-faculty trainers so that we can decide if the matter is embraced by the CBA giving the Arbitrator jurisdiction to hear the matter. While the difference in their duties may be insignificant, their status may constitute a substantial difference. Until there is some explanation as to whether there is any real difference in the status between faculty and non-faculty members, we are unable to determine whether there is a significant difference between the two classifications. Because we are unable to make that determination and that controls whether the CBA applies, we are, correspondingly, unable to decide whether the Arbitrator had jurisdiction to hear this matter.

Accordingly, the order of the Arbitrator is vacated and the matter is remanded for findings that explain what the Arbitrator meant by the statement "it is not clear what faculty status means" taken with his

statement that there is no significant difference between faculty and non-faculty status other than the term "faculty."

### *O R D E R*

AND NOW, this 9th day of May, 2002, the Award of the American Arbitration Association, Labor Arbitration Tribunal, dated April 11, 2001, at Case No. 14 390 00691 00 EVH, is vacated and the matter is remanded to the Arbitrator for findings to determine if there is a substantial difference between faculty and non-faculty status.

Jurisdiction relinquished.