THOMPSON, Presiding Judge.
The Alabama State Personnel Board appeals the judgment of the Montgomery Circuit Court reversing its decision upholding the termination of Michael Hardy’s employment with the Alabama Department of Youth Services (“DYS”). For the reasons stated herein, we reverse the Montgomery Circuit Court’s judgment.
Michael Hardy began his employment with DYS in 1987. In June 2005, one of Hardy’s subordinates, Tera McMillian, complained that Hardy had sexually harassed her. Debra Spann, DYS’s personnel manager, was assigned to investigate McMillian’s complaint. As part of her investigation, Spann questioned both Hardy and McMillian, among others.
On July 14, 2005, Hardy filed a “grievance” with Spann against McMillian, which read:
“Please consider this memo pursuant to DYS policy 3.13.1, i.e., filing of a grievance. Ms. Tera McMillian, a former Paige Hall Staff, has continued to make unsubstantiated derogatory statement[s] referencing the writer. Additionally, she has encouraged past and present employees (some of which have been disciplined by the writer) to interfere with an ongoing investigation and file false claims.
“Due to the fact that this investigation is ongoing, I am filing this claim with your office for assignment to the proper authority.”
On the same day, in addition to the grievance, Hardy sent three separate memoran-da to Spann in which he denied having sexually harassed McMillian, accused McMillian of lying about him in order to be transferred to a different shift, accused DYS of discriminating against him on the basis of his gender, and requested that he *543 be transferred to DYS’s training division. Hardy based his request for a transfer on an on-the-job injury, gender discrimination against him, DYS’s “failure to adhere to policy,” and hypertension and an ulcer allegedly caused or exacerbated by DYS’s management. Spann copied Walter Wood, the executive director of DYS, and others on both Hardy’s grievance and his three memoranda. Spann also forwarded Hardy’s grievance to DYS’s legal department.
After she completed her investigation, Spann wrote a memorandum to Wood describing her findings. She wrote that she found McMillian’s complaint to be valid and that she “definitely [felt] one or more of the incidents which were described to her [during the course of her investigation] occurred.” She recommended that Hardy be disciplined for his actions and that all staff members be retrained on DYS’s sexual-harassment policy.
In a letter dated November 4, 2005, Wood formally informed Hardy of the violations alleged against him. He wrote:
“I have received a recommendation that disciplinary action be taken regarding your employment as a Youth Services Counselor I. The recommendation reveals the following alleged inappropriate conduct and work performance as the reason for the recommendation:
“Violation of the Rules of the State Personnel Board (670-X-19-.01(lg)— disruptive conduct) and/or violation of the Rules of the State Personnel Board (670-X-19-.01(2e) — use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board (670-X-19-.01(2j) — serious violation of any other department rule), and/or violation of DYS Policy (B. 13.2 — Prohibition of Sexual Harassment): Specifically, you were alleged to have made sexual advances and/or to have created a hostile working environment for a subordinate employee, Tera McMillian, who filed a harassment complaint against you. In response to Ms. McMillian’s harassment complaint you are alleged to have attempted, among other things, to cause an investigation against her for her having filed a complaint against you.
“Based on the investigation of the complaint against you, the recommendation I have received, a review of your personnel file and review of your past work history, it is my judgment that a hearing be held to determine whether disciplinary action is warranted.”
Thereafter, DYS held a pre-disciplinary, fact-finding hearing, over which Marcia Calendar, Wood’s executive assistant, presided. At the hearing, Hardy called and questioned several witnesses in his defense and was given the opportunity to make arguments on his behalf. Following the hearing, Calendar provided a memorandum to Wood in which she summarized the allegations against Hardy and found that the allegations against Hardy were substantiated. As part of her recommendation, she wrote:
“Upon a review of the evidence presented during the hearing and a review of Mr. Hardy’s personnel file including past performance evaluations, the following recommendation is made:
“Terminate Mr. Hardy’s employment as a Youth Services Counselor I for the stated allegations which were found to be substantiated. [Hardy] was [McMil-lian’s] supervisor. He was aware of the prohibitions against sexual harassment and he was well aware of the anti-retaliation policy.
“[Hardy] denies that he sexually harassed Ms. McMillian as Ms. Spann concluded. He argues that Ms. McMillian was working a second job with a Hyundai supplier and that her second job shift began before her DYS shift ended. *544 He argues that she had a motive to fabricate the allegation and thereby acquire more favorable working hours. Ms. Spann investigated his defense and found it not credible, based in part on Ms. McMillian’s denial that she had a second job. I now have reason to doubt Ms. McMillian. Specifically, Ms. McMil-lian recently informed Ms. Spann that she does have a second job, but she stated it began within the past two months — well after she made her sexual harassment complaint against Mr. Hardy. The existence of a possible motive for fabrication which has come to light since Ms. Spann’s investigation thus creates a question whether Ms. Spann’s conclusion was correct.
“However, that doubt is insufficient to cause me to contradict Ms. Spann or to recommend disciplinary action less than termination. Mr. Hardy clearly attempted to retaliate against Ms. McMil-lian for filing the complaint against him. Mr. Hardy is, or should be, familiar with the grievance procedure which requires grievances to follow the chain of command, yet he filed this ‘grievance’ with the personnel director. Moreover, the substance of this ‘grievance’ was neither within the scope of the grievance procedure nor within the scope of the anti-discrimination complaint procedure— which requires complaints to be directed to the personnel director. Mr. Hardy is well aware how personally disturbing it is to be investigated by DYS. Witnesses confirmed that Mr. Hardy had discussed this with them prior to Mr. Hardy’s retaliatory ‘grievance’ against Ms. McMillian. I find that Mr. Hardy initiated the ‘grievance’ to retaliate against Ms. McMillian. This agency can no more tolerate retaliation than sexual harassment itself.”
In a letter dated January 6, 2006, Wood advised Hardy that his employment with DYS was terminated as of that date for one or more of the four violations listed in his letter to Hardy of November 4, 2005.
Hardy appealed his dismissal to the Alabama State Personnel Board (“the Board”). Julia Weller, an administrative law judge (“the ALJ”), was appointed to hear Hardy’s appeal and to make a recommendation to the Board. The ALJ set Hardy’s appeal for a hearing in March 2006. At the request of the parties, the hearing was continued to May 8, 2006. Though the hearing began on May 8, it did not conclude that day. The second and final day of the hearing was June 10, 2006. The parties each filed post-hearing submissions; Hardy filed a 58-page brief on July 25, 2006, to which DYS filed a 2-page letter response on August 11, 2006.
On August 1, 2007, the ALJ filed a recommended order with the Board. In the recommended order, she reviewed the allegations against Hardy and the testimonial and other evidence presented at the hearing. She then provided the following discussion and recommended disposition:
“The purpose of the Administrative Appeal is to determine if the termination of the Employee is warranted and supported by the evidence.... In determining whether employee’s dismissal is warranted, the departmental agency bears the burden of proving the charges warrant termination by a ‘preponderance of the evidence.’ The law is well settled that a ‘preponderance of the evidence’ standard requires a showing of a probability that the Employee is guilty of the acts as charged. Thus, there must be more than a mere possibility or one possibility among others that the facts support the disciplinary action at issue, the evidence must establish that more probably than not, the Employee per *545 formed, or failed to perform, as charged....
“Violations of DYS Sexual Harassment Policy
“Based upon the evidence presented, the undersigned was convinced that Hardy had more than a work-related relationship with McMillian and violated DYS sexual-harassment policy. The testimony of [Veronica Harris, a friend of McMillian’s,] also convinced the undersigned that Hardy made comments to McMillian which were inappropriate for the workplace. However, the undersigned was NOT convinced that McMilli-an was the victim of sexual harassment. While Hardy’s conduct as a supervisor was subject to disciplinary action, the undersigned does not believe that Hardy’s advances were unwelcome. McMil-lian’s testimony was exaggerated and lacked complete credibility and candor. Clearly, McMillian possessed a host of other personal motivations for her testimony. While McMillian and Hardy had some sort of relationship for some period of time, any relationship between the two involved McMillian’s complicity. Nevertheless, that does not excuse Hardy for engaging in what he should have known could have been misconstrued as an inappropriate verbal exchange with a subordinate. Therefore, the undersigned does find that Hardy’s verbal conduct supports termination.
“Regardless of Hardy’s relationship with McMillian, his most egregious offense, however, is the manner in which he handled the investigation of McMilli-an’s [Equal Employment Opportunity Commission] and sexual harassment complaint, as hereinafter discussed.

“Violations of the Grievance Procedure and Disruptive Conduct

“Despite the fact that McMillian’s credibility has questionable merit, equally or more serious than the sexual harassment charge is the disruptive conduct, potential retaliation, and Hardy’s violation of the grievance procedure. Employees must be allowed the freedom to have civil rights actions investigated, even if questionable, without the fear of retaliation. If McMillian’s allegations proved to be meritless, the inquiry ends there.
“In the present action, Hardy admitted he provided training on sexual harassment policy on numerous occasions. He also admitted to instructing his employees on the proper procedure to follow when filing claims. McMillian followed the procedures as she had been trained to do.
“Flying in the face of this policy, Hardy also admitted to filing a ‘grievance’ against her for following the very procedure he trained her to follow. As a supervisor, he knew better than to conduct himself in such a harassing fashion. He knew he was not following policy, nor was he following the chain of command as proscribed in DYS Grievance Procedure 8.18.1. Since McMillian had filed a claim with the Personnel Manager, Debra Spann, Hardy in turn filed his ‘grievance’ with Debra Spann. This type of threatening behavior, in and of itself, merited dismissal and was uncharacteristic of a supervisor with his training, background and experience. Such conduct is clearly disruptive and in violation of the Rules of the State Personnel Board 670-X-19-.01(lg) — (disruptive conduct), the Rules of the State Personnel Board 670-X-19-.01(2e) — (use of abusive or threatening language) and/or violation of the Rules of the State Personnel Board 670-X-19-.01(2j) — (serious violation of any other Department Rule). Further, such conduct could also be potentially perceived as retaliatory. *546 This one violation alone was sufficient to warrant Hardy’s dismissal.
“Since the [violations of] above-referenced rules are sufficient to warrant dismissal in this cause, the issue of whether the conduct actually reached the level of retaliation is moot and shall not be addressed in this forum.
“Accordingly, the undersigned finds the totality of the evidence warrants dismissal in this cause. Therefore, the undersigned recommends to the State Personnel Board that the dismissal be UPHELD.”
(Emphasis and capitalization in original.) The ALJ’s recommended order was provided to DYS and to Hardy under a cover letter notifying the parties that either of them was entitled to request oral argument before the Board. Hardy filed exceptions to the recommended order and requested oral argument.
On August 10, 2007, the Board notified Hardy’s counsel that oral argument on Hardy’s appeal had been set for September 19, 2007. On September 19, 2007, Hardy’s counsel failed to appear for oral argument. On the following day, the Board wrote to Hardy’s counsel, noted his failure to attend, and gave him the opportunity to proceed with oral argument. Hardy’s counsel responded that he had not received the Board’s letter setting the date for oral argument, and he requested that oral argument be held. The Board set oral argument of Hardy’s appeal for October 17, 2007, the date of its October meeting.
On October 17, 2007, following oral argument, the Board issued an order affirming DYS’s decision to terminate Hardy’s employment, in which, among other things, it wrote:
“The [ALJ] found that the totality of the evidence warrants dismissal in this cause and recommended that [Hardy’s] dismissal be sustained. The Board hereby adopts by reference the findings of fact and conclusions of law as found by the [ALJ] as a part of this Order as if fully set forth herein. The Board finds that the testimony of [McMillian] is not credible and her complaints of sexual harassment are unfounded; however, [Hardy’s] response to these allegations as a supervisor were inappropriate.
“The Board has carefully considered the [ALJ]’s Report in this case and is of the opinion that the decision of [DYS] to dismiss [Hardy] is supported by the evidence and that the termination is warranted.”
Hardy appealed the Board’s determination to the Montgomery Circuit Court (“the trial court”). After each side filed briefs and oral arguments were heard, the trial court reversed the Board’s decision upholding DYS’s termination of Hardy’s employment. The trial court’s order provided:
“The Court finds that the delay of almost 14 months from the close of the evidentiary hearing before [an ALJ] employed by the State Personnel Board (‘the Board’), along with other procedural problems that attended the Board’s review, amounted to an unlawful procedure violative of constitutional and statutory due process and contrary to the purpose and intent of the Alabama Administrative Procedure Act, Ala.Code Sec. 41-22-1 et seq. The Court further finds not only that the protracted delay was unreasonable under the facts, but also that there was no rational excuse or explanation for the delay and that it resulted in prejudice to substantial rights of [Hardy]. The Court also finds as a practical matter that the remedy in Ala.Code § 41-22-20(f) provided a clearly inadequate remedy for [Hardy] under the facts of this case.
*547 “Based on the foregoing, the Order of the Board is due to be reversed. The Board’s Order, however, is also due to be reversed for another reason, i.e., there is no substantial evidence in the record to support it, and it is, therefore, clearly erroneous.
“The Board found in its final Order that the employee who made sexual-harassment complaints involving [Hardy] lacked credibility, and that the sexual harassment charges were ‘unfounded.’ Moreover, the charge of the use of abusive and threatening language was no more than a subset of the sexual harassment claim, and that allegation was also, therefore, unfounded.
“The basis upon which the Board upheld the termination of [Hardy]’s employment was the disruption that allegedly arose from his filing a grievance asserting that the claim of sexual harassment was untrue. The record, however, is devoid of evidence of any actual disruption arising from that ‘grievance’. There is no evidence, for example, that anything was done with the grievance, that it interfered in any way with DYS’s investigation of the sexual harassment complaint, or even that the employee who made the sexual harassment claim became aware that the grievance had been filed.
“Moreover, the substance of the grievance was no more than what Hardy clearly could have raised in his response to the grievance. But for the word ‘grievance’ having been placed on the submission, DYS would not have objected to it. Although the [ALJ] found that the grievance could be ‘perceived’ as ‘retaliatory’, she made no finding of retaliation, and this court finds from the record that the grievance was not retaliatory, but rather was an effort by [Hardy] to assert that the charge made against him was, in essence, a fraudulent one. That is, the ‘grievance’ was no more than a declaration by [Hardy] of his innocence and a relevant response by him to what the Board found to be false allegations.
“The Court further finds that the designation by [Hardy] of his response to the sexual harassment claim as a ‘grievance’ did not violate DYS’s grievance procedure. The Director of DYS acknowledged in his testimony that DYS had no procedure that addressed the submission made by [Hardy], and the Personnel Manager of DYS testified that she knew of no rule violated by the submission.
“Finally, the Court finds from the record that any involvement of DYS employees in the sexual harassment investigation and review process did not arise from the submission made by [Hardy]. Rather, the involvement of such employees would have occurred had the ‘grievance’ made by [Hardy] been entitled to an answer, or had he simply enlisted the testimony of those employees in response to charges made against him. In any event, there is no evidence either that [Hardy] sought the involvement of other employees or that their involvement was related to his submission of a ‘grievance.’
“In summary, the Court finds that there is no substantial evidence in the record to support the Board’s Order and that the Board’s decision is, therefore, clearly erroneous. For that reason, and, independently, because of the prejudicial violation of [Hardy]’s substantial rights resulting from the procedures used by the Board, the Order of the Board must be reversed.”
The Board filed a timely appeal to this court.
*548 Judicial review of an agency order is governed by § 41-22-20(k), Ala.Code 1975, which provides:
“Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may affirm the agency action or remand the case to the agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
“(1) In violation of constitutional or statutory provisions;
“(2) In excess of the statutory authority of the agency;
“(3) In violation of any pertinent agency rule;
“(4) Made upon unlawful procedure;
“(5) Affected by other error of law;
“(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
“(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.”
Discussing this standard of review, our supreme court has written:
“ ‘ “Judicial review of an agency’s administrative decision is limited to determining whether the decision is supported by substantial evidence, whether the agency’s actions were reasonable, and whether its actions were within its statutory and constitutional powers. Judicial review is also limited by the presumption of correctness which attaches to a decision by an administrative agency.” ’ ”
Ex parte Medical Licensure Comm’n of Alabama, 897 So.2d 1093, 1097 (Ala.2004) (quoting Ex parte Alabama Bd. of Nursing, 835 So.2d 1010, 1012 (Ala.2001), quoting in turn Alabama Medicaid Agency v. Peoples, 549 So.2d 504, 506 (Ala.Civ.App.1989)). Our review of the trial court’s determination in this case is without a presumption of correctness because that court was in no better position to review the Board’s order than is this court. Alabama State Pers. Bd. v. Garner, 4 So.3d 545 (Ala.Civ.App.2008).
As noted above, the trial court reversed the Board’s determination upholding the termination of Hardy’s employment for two distinct reasons. First, it found that the time it took the ALJ to issue a recommended order following the hearing she had held “amounted to an unlawful procedure” that violated “constitutional and statutory due process” and that such delay resulted in prejudice to Hardy’s substantial rights. Second, the trial court determined that the Board’s order was not supported by substantial evidence. For the reasons set forth herein, we conclude that neither of the grounds cited by the trial court support its reversal of the Board’s determination.
The Board contends that the fact of the delay between the close of the hearing before the ALJ and the point at which she made her recommendation to the Board regarding Hardy’s appeal did not violate the Alabama Administrative Procedure Act, § 41-22-1 et seq., Ala.Code 1975 (“AAPA”), the applicable statutory framework in this case. We agree.
*549 Section 41-22-16(a), Ala.Code 1975, controls the question of timing in this case. It provides:
“The final order in a proceeding which affects substantial interests shall be in writing and made a part of the record and include findings of fact and conclusions of law separately stated, and it shall be rendered within 30 days:
“(1) After the hearing is concluded, if conducted by the agency;
“(2) After a recommended order, or findings and conclusions are submitted to the agency and mailed to all parties, if the hearing is conducted by a hearing officer; or
“(3) After the agency has received the written and oral material it has authorized to be submitted, if there has been no hearing. The 30 day period may be waived or extended with the consent of all parties and may be extended by law with reference to specific agencies.”
Pursuant to its regulations, the Board has adopted a procedure for hearing appeals that is controlled by subsection (a)(2) of § 41-22-16. See Alabama State Pers. Bd. v. Garner, supra. Specifically, according to Rule 670-X-5-.07(2), Ala. Admin. Code (State Pers. Bd.), an administrative appeal to the Board is conducted by a hearing officer whose duty is to provide a recommendation to the Board following the hearing. Id. The Board itself does not conduct the hearing. Id. Although the Board is required to issue a ruling within 30 days of the receipt of the hearing officer’s recommendation, the hearing officer is not under any particular statutory duty to provide a recommendation to the Board within a particular time following the hearing.
Hardy argues that when a hearing officer is, like the ALJ in this case, an employee of the Board rather than an independent judge, subsection (a)(1) of § 41-22-16 governs the timing of the entry of a ruling on an employee’s administrative appeal. Thus, according to Hardy, the Board had only 30 days following the conclusion of the hearing before the ALJ to issue a final order on Hardy’s appeal.
The text of § 41-22-16 does not bear out Hardy’s contention that subsection (a)(1) applied to this case. As noted above, the Board did not conduct the hearing in this case, as is required for subsection (a)(1) to apply. Furthermore, there is no language in subsection (a)(2) that requires a hearing officer to be unaffiliated with the Board. Indeed, that subsection specifically contemplates that the hearing officer will act in an advisory capacity to the Board, providing the Board with a recommendation regarding the employment action being appealed.
Ex parte Nixon, 729 So.2d 277 (Ala.1998), which Hardy cites in support of his contention, does not support Hardy’s position either. That case involved the Alabama Department of Human Resources (“DHR”). Pursuant to DHR’s regulations, a hearing officer, following a hearing, issues the final order on behalf of the agency. Rule 660-1-5-.08, Ala. Admin. Code (Dep’t of Human Res.). Thus, the hearing officer acts for the agency, and his or her order constitutes the final order of the agency. As such, a hearing conducted by a hearing officer for DHR is tantamount to a hearing by DHR, and, because the hearing officer issues the final order on the agency action rather than merely providing recommendations to DHR’s governing board, § 41-22-16(a)(l), rather than (a)(2), applies to hearings conducted by a hearing officer for DHR. This procedure stands in contrast to the procedure utilized by the Board, which, as discussed above, requires a hearing officer to provide recommendations to the Board, which, in turn, issues the final decision. Thus, Nixon does not *550 require the application of subsection (a)(1) in this case.
Just as the ALJ’s delay in the present case in issuing recommendations to the Board did not violate the applicable provisions of the AAPA, her actions did not justify the trial court’s conclusion that Hardy’s right to procedural due process had been violated. As the Board points out, the United States Supreme Court has held that a delay in the administrative process does not, by itself, constitute the deprivation of procedural due process. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 547, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (holding that “[a] 9-month adjudication is not, of course, unconstitutionally lengthy per se ”). Following its decision in Loudermill, the United States Supreme Court provided guidance in determining whether a delay in the administrative decision-making process constitutes a violation of procedural due process. In Federal Deposit Insurance Corp. v. Mallen, 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), the Court wrote:
“For even though there is a point at which an unjustified delay in completing a post-deprivation proceeding ‘would become a constitutional violation,’ Cleveland Bd. of Education v. Loudermill, 470 U.S. [532], at 547 [ (1985) ], the significance of such a delay cannot be evaluated in a vacuum. In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.”
Applying the three-factor analysis in Mal-len to the present case provides no basis to conclude that the ALJ’s delay in providing recommendations to the Board constituted a violation of Hardy’s procedural-due-process rights.
In its final order, the' trial court focused entirely on the lack of a reasonable justification for the ALJ’s delay in providing the required recommendations following the hearing. It failed, however, to identify any private interest that Hardy possessed that may have been at issue, and, more importantly, it failed to examine the importance of that interest and the harm to that interest occasioned by the ALJ’s delay. Our own review of the record fails to disclose any evidence of harm or prejudice to Hardy or his rights occasioned by the delay of which he complains.[1] Finally, we *551 conclude that, because of the extensive pre-termination hearing DYS provided to Hardy, at which he was allowed to call and question witnesses, present evidence, and provide argument, there was little likelihood that DYS’s decision was mistaken. Taking all three of the factors identified by the Supreme Court in Medien into account, we conclude that the trial court erred when it determined that the ALJ’s delay in providing the proposed order to the Board violated Hardy’s procedural-due-process rights.[2]
In addition to the foregoing, we hold that the trial court erred in reversing the Board’s determination because of the ALJ’s delay in providing a recommendation to the Board for a separate reason. Our supreme court has plainly indicated that the violation of a statutory or constitutional provision, without more, is an insufficient basis on which to reverse an agency decision under § 41-22-20(k). Discussing the language of § 41-22-20(k), the court wrote in Ex parte Nixon that a “circuit court has discretion to reverse or modify the hearing officer’s report if it was made in violation of statutory provisions, made in excess of statutory authority, or made upon unlawful procedure ..., but only ‘if substantial rights of the petitioner have been prejudiced.’ ” Ex parte Nixon, 729 So.2d at 280 (quoting § 41-22-20(k)).
Although the appellate courts of this state have not closely examined in the abstract the requirement of a finding of prejudice to the substantial rights of the complaining party before reversal is justified because of agency error, courts in other jurisdictions have found that such a provision within their administrative-procedure statutory framework is tantamount to a “harmless-error” rule. See, e.g., City of Des Moines v. Public Employment Relations Bd., 275 N.W.2d 753, 759 (Iowa 1979) (examining a statute similar to § 41-22-20(k) and holding that the requirement that a party demonstrate that its substantial rights have been prejudiced by an *552 agency error is “analogous to a harmless error rule” and constitutes “a direction to the court that an agency’s action should not be tampered with unless the complaining party has in fact been harmed”). Cf. Bar Processing Corp. v. State Tax Comm’n, 171 Mich.App. 472, 481-82, 480 N.W.2d 753, 756-57 (1988) (applying administrative-procedure statute similar to § 41-22-20(k) and holding that a procedural violation that was not the cause of the agency action complained of did not prejudice the substantial rights of the party). This understanding of the prejudice requirement in § 41-22-20(k) comports with our “harmless-error” rule, Rule 45, Ala R.App. P., employing as it does the similar concept that a lower court’s judgment cannot be reversed unless it is shown that the error complained of “injuriously affected substantial rights of the parties.”
In the present case, the trial court held that the ALJ’s delay in providing the Board with recommendations with regard to Hardy’s administrative appeal resulted in prejudice to Hardy’s substantial rights. As set forth, supra, with regard to the second prong of the Supreme Court’s Mal-len analysis, the trial court neither identified the substantial rights to which it referred nor cited any evidence indicating that those rights had been prejudiced. Our review of the record fails to disclose any evidence of prejudice to Hardy’s substantial rights. Specifically, we have found no evidence of any harm that Hardy sustained as a result of the delay in the ALJ’s provision of recommendations to the Board. As a result, the trial court was not permitted to reverse the Board’s determination on the basis of that delay. See Moseley Grocery v. State Dep’t of Pub. Health, 928 So.2d 304, 312 (Ala.Civ.App.2005) (“As no prejudice occurred, the agency action is not due to be set aside under § 41-22-20(k).”).[3]
The trial court concluded, as a separate and independent ground for reversing the Board’s decision upholding the termination of Hardy’s employment, that the Board’s decision was not supported by substantial evidence. The Board contends on appeal that its decision was, in fact, supported by substantial evidence. We agree with the Board.
As previously noted, the Board adopted the ALJ’s recommendation that DYS’s decision to dismiss Hardy on the grounds that his filing of a grievance against McMillian accusing her of making unsubstantiated, false claims about him violated DYS’s grievance procedure, constituted the use of abusive or threatening language in violation of Rule 679-X-19-.01(2e), Ala. Admin. Code (State Pers. Bd.), and constituted disruptive conduct in violation of Rule 679-X-19.01(lg), Ala. Admin. Code (State Pers. Bd.). Substantial evidence supports these findings.
The record provides ample evidence from which the conclusion could be drawn that Hardy knew and understood DYS’s grievance policy. That policy focuses on a chain-of-command approach to the resolution of disputes that arise in job-related situations. According to the policy as it relates to the present case, the first step an employee with a grievance in Hardy’s situation is required to take is to discuss the matter with his or her immediate supervisor, with written documentation of that discussion being maintained. Should that discussion not result in the implementation of “satisfactory corrective *553 measures,” the employee should request a review of the grievance by the facility superintendent. From there, further review is provided up the chain of command until either the employee is satisfied with the result obtained or the executive director of DYS has made a final determination on the employee’s grievance, whichever occurs first.
In the present case, there was substantial evidence indicating that Hardy violated both the intent of the grievance policy and the procedure for filing a grievance. At the hearing before the ALJ, Walter Wood, DYS’s executive director, on examination by DYS’s attorney, testified concerning the grievance Hardy filed against McMillian:
“Q.... You are familiar with the grievance procedure and policy at DYS, right?
“A. Yes, sir.
“Q. Is this so-called grievance an appropriate step for a supervisor to take against a subordinate employee who has filed a sexual harassment claim or charge or complaint?
“A. It’s not appropriate under any circumstances whether sexual harassment or otherwise. The grievance process, there first has to be something that is, in fact, a grievable issue. And attempting to cloud the issue of this complaint that [McMillian] had filed by sending this directly to Debra Spann, even if it were grievable, bypasses the grievance chain of command because you would have to go to his immediate supervisor in a certain number of days and ask for a response and then up the chain of command one level at a time.
“Q. Okay. So is sexual harassment a grievable issue?
“A. No.
“Q. That is covered by a different policy, isn’t it?
“A. Well, let me see if I understand what you’re asking me. From the perspective of the person who is being complained against, I don’t believe there is any mechanism to respond other than to provide information in the investigation. There is not a way to legitimately file grievances and complaints against people after you’ve been complained against.
“Q. So in other words, would you agree with me that we don’t have a policy or procedure whereby an employee who a grievance has been filed against him or her for sexual harassment can simply turn the tables and have the employees investigated?
“A. That’s correct.
“Q. All right. You also mention the chain of command. The grievance procedure, how does it work? This one went to Debra Spann.
“A. That’s correct.
“Q. Would a grievance have gone to Debra Spann?
“A. No, sir.
“Q. It would have gone to whom?
“A. It would have gone to someone actually in the chain of command, like the specialist over the unit that an individual works with, if it’s in the case of a unit manager, to the facility administrator that operates the overall facility, then to the administrators in the — Mr. [Tim] Davis’s[4] — basically Mr. Davis’s *554 chain of command to him. But Ms. Spann is a support person in personnel, not an administrator, nor is she in the chain of command for grievances.”
Thus, Wood’s testimony clearly indicated that Hardy had violated the grievance procedure by both asserting an inappropriate grievance and filing his grievance outside his chain of command. Wood further testified on examination by DYS’s attorney that the grievance, along with other matters that came to his attention, caused him to have to act:
“Q.... Now, as a result of these things that you’ve testified about, the memos that came out, the meeting that you stopped to talk about moving [McMillian] back after we had moved her, this grievance to turn the tables, did you take any action that you remember to address from a broader standpoint these issues? [5]
[[Image here]]
“A. In response to your question about what action I took, I acted on several pieces of information that were coming to me. One was in the form of memos that were being circulated around the campus by *555 people that worked under Mr. Hardy’s supervision. This grievance procedure, it was apparent that this was being discussed a lot on the campus. There were a lot of people becoming involved in it. I was very concerned about the implications that this information that came to me in the form of these memos and discussions with Mr. Davis were clearly retaliatory and created an environment that was unacceptable and that we could not tolerate in our facilities. So we went to the extra length to call the State Personnel Board to bring in outside trainers to do a training session for everybody on campus and available to remind them about the seriousness of those kinds of issues, and we had a staff person from State Personnel come out and conduct additional training specifically on these issues as they relate to appropriate behavior, appropriate mechanisms for handling issues like this and all of this while, you know, we were doing in addition to the investigation going on.”
Based on the evidence of record, including but not limited to Woods’s testimony at the hearing before the ALJ and the procedures set forth in the grievance policy, the ALJ and the Board were justified in concluding: (1) that Hardy knew the proper procedure for the filing and resolution of a grievance; (2) that Hardy willfully failed to follow that procedure in filing his grievance; (3) that Hardy knew the issue he presented in his grievance was not properly submitted as a grievance; (4) that, in filing his grievance, he was merely attempting to turn the table on his accuser, McMillian, and have her investigated for alleged wrongdoing; (5) that Hardy’s action in filing the grievance was, at least in part, the cause of a disruption at the campus at which he and McMillian worked; and (6) that Hardy’s actions could be perceived as retaliatory. These conclusions provide sufficient support for the Board’s ultimate conclusion that Hardy had violated DYS’s policies regarding the grievance procedure, disruptive conduct, and the use of threatening or abusive language.
In its final order, the trial court discounted the foregoing substantial evidence, substituting its own conclusions for those of the ALJ and the Board. The trial court held that there was no evidence indicating that the grievance resulted in any disruption. Woods’s above-quoted testimony, however, provides such evidence. Although it is true that there is no evidence indicating that Hardy’s grievance alone caused a disruption, Woods’s testimony was clear that the grievance contributed to and was a part of the cause of a disruption on the campus.
The trial court also concluded that “the substance of the grievance was no more than what Hardy clearly could have raised in his response to the grievance.” This conclusion overlooks the fact that the substance of the grievance was not a direct response to McMillian’s allegations, which were the subject of the investigation, but was, in large part, a complaint that McMil-lian was “continu[ing] to make unsubstantiated derogatory statements referencing” Hardy. In other words, Hardy was not complaining that McMillian’s allegations were false; he was complaining that she was allegedly continuing to make derogatory statements about him. Indeed, Hardy had shown himself capable of responding directly to McMillian’s allegation of sexual harassment in a nonthreatening manner; on the same day he filed his grievance, he also provided Spann with three memoranda in which, among other things, he denied McMillian’s allegations and suggested that McMillian was lying *556 about him in order to be transferred to a different shift.
The language Hardy employed in his grievance likewise contradicts the trial court’s conclusion as to Hardy’s intent in filing it. The opening sentence provides that Spann should consider the document as a grievance filed pursuant to DYS’s grievance policy. The last sentence references the filing as a “claim” that Hardy was filing “for assignment to the proper authority.” If, as the trial court held, Hardy’s grievance was “no more than a declaration by [Hardy] of his innocence and a relevant response by him” to McMil-lian’s allegations, there would be no reason for Hardy to refer to his filing as a “claim” and there would be no purpose in his seeking to have his filing assigned to the “proper authority.” We find the ALJ’s and the Board’s conclusion as to the purpose of Hardy’s grievance, to cause an investigation of McMillian, is far more plausible than the purpose ascribed to it by the trial court.[6]
We emphasize that it was not merely the fact that Hardy filed a grievance improperly that serves as the basis of his dismissal, and we do not read the ALJ’s recommendation or the Board’s order as indicating such. Instead, as noted by the ALJ and the Board, it was Hardy’s retaliatory intent in improperly filing the grievance, as well as the effect that the improper filing of the grievance had, that justified the termination of his employment.
Based on the foregoing, this court concludes that the Board’s determination was supported by substantial evidence, and, as a result, the trial court’s decision to reverse the Board’s decision is not supported.
For the foregoing reasons, we conclude that the trial court erred when it reversed the Board’s decision upholding DYS’s termination of Hardy’s employment and ordered Hardy’s reinstatement.[7] We reverse the trial court’s judgment in favor of Hardy and remand the case to the trial court for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMAS and MOORE, JJ., concur.
*557 PITTMAN, J., concurs in the result, without writing.
BRYAN, J.,concurs in the result, with writing.

. Indeed, a lack of harm to Hardy can be seen not only in the fact that the record is devoid of evidence of such harm, but also in the fact that Hardy failed or refused to take advantage of the standing conferred on him by the AAPA to seek a court order requiring the Board to hasten its determination of his appeal. Specifically, § 41-22-20(f) provides that "[u]n-reasonable delay on the part of an agency in reaching a final decision shall be justification for any person whose rights, duties, or privileges are adversely affected by such delay to seek a court order compelling action by the agency.”
The trial court held that "the remedy in Ala.Code § 41 — 22—20(f) provided a clearly inadequate remedy for [Hardy] under the facts of this case,” without any explanation of why this is so. In his brief, Hardy argues that the remedy afforded by that section was inadequate because it would have required him to, in effect, "sue [the ALJ] for an order stating that she had not done her job and ordering her to do so.” Hardy argues that seeking such an order would have likely prejudiced the ALJ against him and lessened the chance of a favorable recommendation from her. We reject this faulty reasoning. The sheer volume of mandamus petitions our appellate courts receive regularly is a clear indication that the intervention of higher tribunals for the correction of perceived errors and injus *551 tices is sought as a regular part of the contemporary litigation process.
Furthermore, were we to adopt the trial court's conclusion that § 41-22-20(f) is ineffective in adversarial, administrative proceedings, such a holding would create the situation where a litigant can obtain a reversal of a final agency action simply by sitting idly by while his or her rights are allegedly infringed by an administrative delay, while a diligent litigant, seeking to protect his or her rights by filing an action under § 41-22-20(f), could not obtain similar relief if successful in the court proceeding to speed the agency's action. Thus, the trial court’s determination as to tire applicability of § 41 — 22—20(f) in this case creates a disincentive to its use by litigants in the future. Such an interpretation is also contrary to the principle that "[t]he preferred remedy for administrative delay is an order compelling agency action, not a reversal of the eventual agency decision.” 2 Am.Jur.2d Administrative Law § 572 (2004).

. We note that the trial court did not specify whether it was relying on the Alabama Constitution or the United States Constitution when it determined that the complained-of delay violated Hardy’s "constitutional rights.” Although it is true that the Due Process Clauses of the state and federal constitutions are not necessarily coextensive for all purposes, see, e.g., State v. Thrasher, 783 So.2d 103, 106 (Ala.2000) ("[T]he Alabama Constitution may afford a defendant greater due-process protections than the Constitution of the United States provides ....”), neither party argues that the protection of procedural due process in the Alabama Constitution is qualitatively different or quantitatively more expansive than that provided in the United States Constitution as those provisions relate to the present case. Certainly, a textual comparison of each provision provides no basis on which to conclude that the application of the Due Process Clause in the Alabama Constitution would result in a conclusion different from that which we reach under the federal constitutional analysis set forth supra. Compare Art. I, § 6, Ala. Const. 1901, with U.S. Const, amend. V.

. In its final judgment, the trial court referenced without explanation "other procedural problems that attended the Board’s review.” Our review of the record fails to disclose other procedural problems, the effect of which were to prejudice Hardy's substantial rights.

. Tim Davis was the deputy director of DYS and was in charge of DYS’s institutional operations.

. The reference in the question to other mem-oranda and a meeting are explained in the following testimony from Wood during examination by DYS's attorney:
"Q. Okay. In connection with this matter regarding Mr. Hardy, did you have any conversations with Mr. Davis?
“A. Well, over the course of the period of time all of this was going on, I'm sure we talked at times about the incident. There was some of my closest, of you can say, involvement in what was going on was a discussion with Mr. Davis after we had received a bunch of memos. After the incident had been reported and I believe after Ms. Spann had initiated an investigation, there were some memos written to instruct [McMillian] — it was either to attempt to have her reassigned back to Mr. Hardy's unit. There was an effort to call her in for a face-to-face meeting with Mr. Hardy in charge of the meeting, all of this right on the heels of the complaint. Mr. Davis and I talked about that as being inappropriate, and I believe Mr. Davis was instructed to make sure that anything that smacks of intimidation or retaliation or anything like this was stopped. And I believe that he did make sure those meetings did not take place.
"Q. Okay. Why did you feel that it was important to make sure that Mr. Davis stopped those meetings from taking place?
“A. Ms. Spann had already initiated the investigation. She had taken what I think was an appropriate step with the cooperation of [McMillian] to have her reassigned to another dormitory which would be usual practice I would think — ....
"A. In this circumstance, which has also been my experience in similar cases, that [McMillian] was separated by being reassigned to another dormitory. It was my understanding that the nature of one of the memos was to complain about [McMillian] being reassigned and demanding she be put back under [Hardy's] supervision and that, secondary to that, a meeting be held where she be forced to come into a meeting with [Hardy]. All of this to me was clearly an attempt to bring this situation under [Hardy's] control to intimidate [McMillian]. In my view, this action was totally inappropriate. I think it easily in my mind was — crossed the line into what I— clearly to me was intimidation and could easily be classified as retaliatory. It was a situation where [McMilli-an] should not have been placed in and that she did not deserve to be placed in, and so we stopped the efforts to do that at that point.”
Woods also testified about the fact that he received several memoranda from Hardy's subordinates supporting Hardy.

. The trial court also referenced the testimony of Woods and Spann as a basis for concluding that Hardy's designation of his grievance as a grievance did not violate DYS's grievance procedure because, according to Woods's testimony, DYS had no procedure that addressed Hardy’s submission and because Spann, in her deposition testimony, indicated “that she knew of no rule violated by the submission.” Our review of Woods’s and Spann's testimony fails to disclose support for the trial court’s proposition. Woods plainly testified that Hardy had violated the grievance procedure because he had asserted a grievance that was inappropriate and because he filed his grievance outside his chain of command. The portion of Spann’s deposition testimony on which the trial court apparently relied is found in the following exchange between her and Hardy's attorney:
"Q. Okay. According to this policy, Mr. Hardy, then, would be — 'The griev-anee procedure is a method of settling disputes and breakdowns in communication in a job-related situation. Suspensions and dismissals are not covered by this procedure.' So, if he had a grievance he wanted to file that was not regarding a suspension or dismissal, he could file this according to your — he could file a grievance according to this policy; is that correct?
"A. I would assume so.”
This testimony does not support the trial court's conclusion that Spann knew of no procedure violated by Hardy's filing of his grievance with her.

. Because we reach this conclusion, we do not address the Board's additional contentions that the trial court erred when it ordered backpay and benefits in favor of Hardy and taxed costs against the Board.